**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-01464-NYW

CENTER FOR BIOLOGICAL DIVERSITY and
FOOD & WATER WATCH,

      Plaintiffs,

v.

SWIFT BEEF COMPANY,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter is before the court on Defendant Swift Beef Company's ("Swift Beef" or "Defendant") Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ("Motion to Dismiss") [#20, filed December 6, 2019] and Plaintiffs Center for Biological Diversity ("CBD") and Food & Water Watch's ("FWW" and collectively, "Plaintiffs") Motion for Leave to File Sur-reply [#37, filed February 17, 2020].  The court considers the pending motions pursuant to 28 U.S.C. § 636(c) and the Order of Reference dated July 1, 2019 [#14].  After considering the Parties' briefing, including the Sur-reply submitted by Plaintiffs on February 17, 2020 [#37-1]; arguments at the February 21, 2020 hearing; and the applicable law, the court **DENIES** Defendant's Motion to Dismiss in its entirety and **DENIES** Plaintiffs' Motion for Leave to File Sur-reply.

## BACKGROUND

      Plaintiffs bring this action to enforce the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et. seq.*, commonly known as the Clean Water Act ("CWA"), against Swift Beef.  The CWA prohibits the discharge of any pollutant from a point source into navigable waters of the

United States, unless such discharge is authorized by and compliant with a CWA permit. 33 U.S.C. §§ 1311(a), 1342. Permits authorizing such discharges under the CWA are implemented in part through the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. § 1342. NPDES permits are issued by the United States Environmental Protection Agency ("EPA") and impose effluent limitations and standards designed to protect water quality standards consistent with the mandates of the CWA. The EPA has been granted delegatory authority over NPDES permitting and may delegate the program to states. 33 U.S.C. § 1342(b); 40 C.F.R. § 123.61. The EPA delegated NPDES permitting authority to the state of Colorado in 1975. *See* Colo. Rev. Stat. § 25-8-202(6), (7). Through the Water Quality Control Division ("WQCD") of the Colorado Department of Public Health and Environment ("CDPHE"), Colorado is authorized to issue CWA permits and enforce the state's NPDES permitting program (known as the Colorado Discharge Permit System or "CDPS").

Pursuant to its citizen-suit provision, the CWA authorizes citizens to bring enforcement actions against any person "alleged to be in violation" of "an effluent standard or limitation," including permit terms, conditions, limits, and requirements. 33 U.S.C. §§ 1365(a), 1365(f)(6). For purposes of CWA liability, discharges in violation of NPDES permits also constitute violations of the CWA. 40 C.F.R. § 122.41(a). Plaintiffs bring three claims against Swift Beef pursuant to § 1365(a).

The following facts giving rise to Plaintiffs' claims are drawn from the Complaint and the briefing associated with the Motion to Dismiss and taken as true for the purposes of this instant Motion.[1] Swift Beef is a wholly owned subsidiary of JBS USA and JBS S.A., the latter of which is a Brazilian company and the world's largest producer of beef, chicken, and pork. [#1 at ¶ 12].

---

[1] As discussed in further detail below, this court proceeds with its consideration of standing through a facial analysis.

2

Relevant here, Swift Beef is headquartered in Greeley, Colorado.  [*Id.* at ¶ 14].  There, at its Lone Tree Wastewater Treatment Facility ("Lone Tree Facility"), Swift Beef accepts and treats waste from two animal slaughterhouses.  [*Id.* at ¶ 1].  Swift Beef owns and operates the Lone Tree Facility.  [*Id.* at ¶ 12].

Lone Tree Creek, a tributary of the South Platte River, flows through the Lone Tree Facility.  [*Id.* at ¶ 19].  The confluence of Lone Tree Creek and the South Platte River is located approximately one mile south of the Lone Tree Facility as the crow flies, [*id.*], and 3.07 miles downstream as the water flows, [#35 at 17].  The Lone Tree Facility treats wastewater it receives via pipeline from two slaughterhouses owned and operated by Swift Beef.  [#1 at ¶ 23].  After treatment, the wastewater is typically stored for thirty days in one of two large holding ponds before being discharged into the Lone Tree Creek.  [*Id.*].

Swift Beef is authorized to discharge effluent into the Lone Tree Creek pursuant to a Colorado Pollution Discharge Elimination System permit (the "Permit") issued by the WQCD on October 9, 2012.  [*Id.* at ¶ 24; #27-1 at 27-53].  The Permit went into effect on December 1, 2012 and remains effective pursuant to an indefinite administrative extension authorized by the WQCD on December 1, 2017.  [#1 at ¶ 24].  Pursuant to the Permit, Swift Beef is authorized to discharge effluent into the Lone Tree Creek from one pipe (the "Outfall"), though the Permit sets forth variable limits, reflected as Outfall 001, Outfall 002, and Outfall 003, which depend on the number of animals slaughtered per month at the Swift Beef slaughterhouses.  [*Id.* at ¶ 25].  Swift Beef is required to report to the WQCD, two days prior to the start of each month, the number of animals to be slaughtered in that month to inform the WQCD which of the Permit's limits and conditions apply for the upcoming month.  [*Id.*].  The Permit also requires Swift Beef to self-sample its effluent discharges and sets forth mandatory self-testing parameters for Swift Beef, who must

report to both the WQCD and the EPA the results of its self-sampling in publicly available Discharge Monitoring Reports ("DMRs"). [*Id.* at ¶ 26].

Due in part to "significant ammonia-related violations" at the Lone Tree Facility, [*Id.* at ¶ 27], the Permit also requires "chronic" Whole Effluent Toxicity ("WET") testing and limits "to evaluate the sublethal effect of the Lone Tree Facility's effluent." [*Id.* at ¶ 28]. WET testing of a discharged effluent measures a test organism's response to the "synergistic toxic effect of multiple pollutants," and the Permit requires Swift Beef to conduct WET testing of the Lone Tree Facility's effluent's impact on a water flea (*ceriodaphnia dubia*) and a fathead minnow (*pimephales promelas*). [#1 at ¶ 30]. Specifically, Swift Beef must conduct two types of WET testing on a quarterly basis. [*Id.* at ¶ 31]. First, Swift Beef must conduct a test known as the "25-percent seven-day inhibition concentration" ("IC25") standard, which requires use of 100 percent effluent (i.e., no dilution of the effluent is permitted) and is designed to identify the effluent concentration at which no more than 25 percent of test organisms experience reproduction or growth inhibition after seven days of exposure. [*Id.*]. Second, Swift Beef must conduct a "no observed effects concentration" ("NOEC") test, which also requires use of 100 percent effluent and is designed to determine the highest concentration of effluent discharge to yield no detectable effects on the test organisms. [*Id.*].

The Permit required Swift Beef to begin WET testing and self-reporting in the fourth quarter of 2012. [*Id.* at ¶ 32]. Swift Beef observed violations of its WET testing limits immediately and, ultimately, reported to the WQCD that the WET violations were caused by Swift Beef's use of sodium chloride for hide processing at its Beef Plant. [*Id.* at ¶ 33]. Swift Beef violated its WET limits during every quarterly testing period between the fourth quarter of 2013 through the end of 2015. [*Id.* at ¶ 34]. After negotiations with the WQCD, and in an effort to mitigate the sodium

chloride in its effluent to reach compliance with its Permit, Swift Beef purchased and installed a salt evaporator at its Beef Plant in 2015. [*Id.* at ¶¶ 34-35]. The salt evaporator was not operational by the end of 2015. [*Id.* at ¶ 35]. In 2016, 2017, and 2018, Swift Beef continued to pipe wastewater from its Beef Plant (and other slaughterhouse) to the Lone Tree Facility, and in every quarter from Q1 of 2016 through Q4 of 2018, Swift Beef reported violations of the WET limits contemplated by its Permit. [*Id.*].

The salt evaporator installed at Swift Beef's Beef Plant involves a combustion process that emits air pollution; accordingly, Swift Beef is required to comply with air pollution laws in order to operate the salt evaporator. [*Id.* at ¶ 36]. In February 2015, Swift Beef filed an Air Pollutant Emission Notice for its salt evaporator and was ultimately issued an air permit by Colorado's Air Pollution Control Division. [*Id.*]. Subsequently, seeking to reduce air emissions from the salt evaporator to avoid the need to apply for a "major source" air permit, Swift Beef installed a "scrubber" on the salt evaporator in December 2017. [*Id.* at ¶ 37].

In 2018, Swift Beef violated its WET testing limits in each quarter. [*Id.* at ¶ 38]. In July of that year, after observing "additional and unexpected emissions of particulate matter from operating the salt evaporator," Swift Beef filed a modified Air Pollutant Emission Notice and permit application to the State of Colorado. [*Id.* at ¶ 39]. To date, a modified air permit encompassing additional emissions from the salt evaporator has not been issued. [*Id.*].

Based on the foregoing, according to Plaintiffs, "Swift Beef is likely to continue to violate WET testing limits at the Lone Tree Facility." [*Id.* at ¶ 35]. Thus, Plaintiffs' first claim for relief ("Claim 1") is brought pursuant to the CWA for Swift Beef's alleged violations of the WET testing limits of its Permit and Plaintiffs' second ("Claim 2") and third ("Claim 3") claims for relief, also

brought pursuant to § 1365 of the CWA, allege past and ongoing violations of Parts I(B)(3)(c) and I(B)(3)(a) of Swift Beef's Permit, respectively.  [*Id.* at ¶¶ 62, 67-77, 79-91].

In its Motion to Dismiss, Swift Beef raises a Federal Rule of Civil Procedure 12(b)(1) challenge to Plaintiffs' assertion of this court's subject matter jurisdiction.  Specifically, Defendant argues that Plaintiffs lack Article III standing.  Swift Beef also argues for dismissal of Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  In support of its Motion to Dismiss, Swift Beef attaches the declaration of Fernando Meza ("Meza Declaration"), the Facility Environmental Manager for the Lone Tree Facility, as an exhibit thereto.  *See* [#20-1].  The Meza Declaration asserts that Swift Beef achieved compliance with its WET testing limits for all four quarters of 2019.  *See* [*id.* at ¶¶ 2, 5-8].

With their Response to the Motion to Dismiss, Plaintiffs include numerous exhibits and affidavits.  *See* [#27-1; #27-2; #27-3; #27-4; #27-5; #27-6].  Exhibit 1 to Plaintiffs' Response is the Affidavit of Neil Levine, Plaintiffs' counsel, and includes thirty-five exhibits and 286 pages of supporting evidence—including, among other documents, notices, applications, and permits related to both Swift Beef's effluent discharges and its air emissions. [#27-1].  Exhibit 2 is the Affidavit of Jackie Eubank ("Eubank Declaration"), an FWW member and former JBS USA employee.  [#27-2 at ¶¶ 2-3].  Ms. Eubank hunts turkeys on the South Platte River, and accesses the river from the Centennial Valley State Wildlife Area a few miles downstream from the confluence of Lone Tree Creek and the South Platte River.  [*Id.* at ¶ 4].  Ms. Eubank explains that "knowing that the [South Platte] River is more polluted than it would be if [Swift Beef] were in compliance with the Clean Water Act is reducing and will continue to diminish [her] overall experience" hunting turkeys, including "the overall aesthetic experience of being in nature, sitting under the trees, and watching . . . [wildlife]."  [*Id.* at ¶ 8].  Ms. Eubank continues:

> I am concerned about the water quality of the [South Platte] River because it affects my aesthetic experience of hunting around it, as well as the habitat value it has for turkey and other wildlife that I rely on. I am concerned that [Swift Beef's] permit violations will cause harm to the ecosystem that I rely on, because I know that the turkeys I hunt and the other wildlife in the area are reliant on a healthy river. It would enhance my experience to know that the River was less polluted and protected from [Swift Beef]'s unlawful activities.

[*Id.* at ¶ 9].

Exhibit 3 is the declaration of Robert Ukeiley ("Ukeiley Declaration"), a member of CBD. [#27-3 at ¶ 1]. Mr. Ukeiley states that his "recreational and aesthetic interests in the South Platte River and surrounding environment are being injured by Swift Beef's operations of its Lone Tree [Facility]—namely Swift Beef's violations of the Clean Water Act that . . . add saltwater to the South Platte River." [*Id.*]. In April 2019, Mr. Ukeiley rafted the South Platte River, including upstream of Lone Tree Creek, through the confluence, and downstream on the South Platte River. [*Id.* at ¶ 8]. Mr. Ukeiley states that his "recreational experiences on the river downstream [were] made less enjoyable because of the illegal wastewater discharges coming the [sic] Swift Beef's treatment plant and the flows entering the South Platte from Lone Tree Creek," and "knowing that the harm is caused by elevated concentrations of salt makes [him] concerned for the health of this riverine environment and its longevity." [*Id.* at ¶ 12].

Exhibit 4 is the declaration of Jeremy Nichols ("Nichols Declaration"), a member of CBD. [#27-4 at ¶ 5]. Mr. Nichols explains that, "[t]wice in the spring of 2019, [he] paddled along a stretch of the South Platte where Lone Tree Creek joins the South Platte River." [*Id.* at ¶ 8]. At the confluence of Lone Tree Creek and the South Platte River, Mr. Nichols "enjoyed viewing several cottonwoods along the banks on both the river and the creek at the junction," and "was concerned about the potential harm to the cottonwoods and dependent wildlife in this area of the river as a result of exposure to increased salinity in the river," because "[k]nowing the [Lone Tree

Facility] is discharging salt in excess of its Clean Water Act permit limits concerned [Mr. Nichols] and diminished [his] enjoyment of the area." [*Id.* at ¶ 11].

In Reply, Swift Beef included additional evidence. Specifically, Swift Beef attached to its Reply the declaration and expert report of Miles M. Smart, PhD ("Dr. Smart"). [#35-1]. Dr. Smart has a PhD in freshwater ecology and was retained by Swift Beef to examine and offer opinions about the impact of effluent discharge from the Swift Beef Lone Tree Facility on the South Platte River. [#35-1 at ¶ 4]. In summary, Dr. Smart opines that "the actual impact of the effluent discharge by the time the effluent reaches the South Platte River – even during the time period Swift Beef was not in compliance – was negligible." [#35 at 16]. Based on Dr. Smart's opinion, Swift Beef argues that "because there is negligible impact on the South Platte River from the effluent, Plaintiffs cannot reasonably base any fear of future injury on the Facility's effluent discharge." [*Id.* at 18].

In turn, Plaintiffs sought leave to file a Sur-Reply, arguing that Swift Beef had raised a new argument for the first time on Reply. [#37]. The proposed Sur-Reply argues that Defendant's newly raised argument should be disregarded, and the use of an expert report in conjunction with the Motion to Dismiss was improper. [#37-1]. Plaintiffs further argued that even if the court were inclined to consider Defendant's newly raised argument that the discharge resulted in minimal impact on the South Platte River and its streamside-riparian vegetation, such argument lacked merit. [*Id.*].

Because the type of attack on subject matter jurisdiction affects the court's analytical framework, this court first resolves that question first. I then consider whether Plaintiffs should be permitted to file a Sur-Reply. Finally, I turn to the merits of Defendant's challenge.

## LEGAL STANDARDS

### I.   Subject Matter Jurisdiction and Standing

Federal courts are courts of limited jurisdiction.  Under Article III of the United States Constitution, federal courts only have jurisdiction to hear certain "cases" and "controversies." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).  As such, courts "are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction."  *The Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162, 1179 n.3 (10th Cir. 2011) (Gorsuch, J., concurring).  Indeed, courts have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party.  *Image Software, Inc. v. Reynolds & Reynolds, Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)).

A plaintiff must establish Article III standing to bring each of his claims separately.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007).  The standing inquiry has two components: constitutional and prudential.  To establish constitutional standing, a plaintiff must demonstrate "(1) an 'injury in fact,' (2) sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  A plaintiff must also satisfy the requirements of prudential standing.  To establish prudential standing, a plaintiff must (1) assert his own rights, rather than those belonging to third parties; (2) demonstrate that his claim is not simply a "generalized grievance;" and (3) show that plaintiff's grievance falls within the zone of interests protected or regulated by statutes or constitutional guarantee invoked in the suit.  *See Bd. of Cty. Comm'rs of Sweetwater Cty. v. Geringer,* 297 F.3d

1108, 1112 (10th Cir. 2002) (citations omitted).  The elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case."  *Lujan*, 504 U.S. at 561.  Therefore, Article III standing cannot be assumed; the court must resolve issues of standing before it may reach the merits of an issue.  *See Colorado Outfitters Ass'n v. Hickenlooper ("Colorado Outfitters II")*, 823 F.3d 537, 543 (10th Cir. 2016).

Attacks on subject matter jurisdiction may take two different forms, which in turn, implicate different analytical frameworks.  The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has explained that

> [m]otions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may take one of two forms.  First, a party may make a facial challenge to the plaintiff's allegations concerning subject matter jurisdiction, thereby questioning the sufficiency of the complaint.  In addressing a facial attack, the district court must accept the allegations in the complaint as true.  Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter depends.  In addressing a factual attack, the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).

*United States v. Rodriquez Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001) (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)) (further citations omitted).  *See also S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) (on a facial attack, "[w]hen evaluating a plaintiff's standing at the stage of a motion to dismiss on the pleadings, 'both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'"  (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))); *Holt*, 46 F.3d at 1002-03 (when a factual challenge is made, there is no presumption of truthfulness attached to the plaintiff's allegations).

## II.    Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted).  "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id*.  The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Swift Beef argues that Plaintiffs lack Article III standing because they have failed to establish a concrete and particularized injury, traceability, and redressability. *See generally* [#20]. But given the extrinsic evidence offered in this matter, it is not entirely clear whether Defendant is pursuing a facial or factual attack to subject matter jurisdiction.  Thus, the court first considers

what type of attack to standing Defendant mounts; then, the scope of the record before the court; and finally, whether Plaintiffs satisfy standing under the appropriate standard of review.

## I.      Standing Framework

Upon consideration of Defendant's Motion to Dismiss, this court finds that it is more appropriate for this court to consider the instant Motion as a facial attack under Rule 12(b)(1).  In its affirmative Motion, Defendant focuses on Plaintiff's allegations which implicate a facial challenge.  [#20 at 2 ("Plaintiffs have not <u>alleged</u> facts sufficient to demonstrate that the claimed permit violations are the cause of any particular injury, so dismissal is proper.  Plaintiffs <u>allege</u> nothing more than a general statement that Swift Beef's purported permit violations have caused injury."), 7 ("Plaintiffs' Complaint Fails to Adequately Plead Causation or Individual Member's Alleged Injuries"), 12 ("[T]his Court . . . should dismiss Plaintiffs' Complaint under Rule 12(b)(1) for failure to adequately <u>allege</u> causation for Article III standing."), 13 ("Plaintiffs' Complaint fails to adequately <u>allege</u> standing and causation.")].  *See also California Sportfishing Protection Alliance v. All Star Auto Wrecking, Inc.*, 860 F. Supp. 2d 1144, 1150-51 (E.D. Cal. 2012) ("Though both parties have supplied the Court with extrinsic evidence, Defendant['s] motion to dismiss clearly attacked the sufficiency of the allegations in the [Complaint] to establish jurisdiction on its face." (citing *Coalition for a Sustainable Delta v. City of Stockton,* 2009 WL 6697824, *2 (E.D. Cal. Aug. 21, 2009) (noting that despite both parties including extrinsic evidence in their filings in the form of declarations and affidavits, the defendant made a facial attack because it asserted that the complaint was, on its face, insufficient to invoke federal jurisdiction))).

On Reply, Defendant further clarifies that "the instant motion is based on Plaintiffs' failure to plead – and now prove – that they have standing to bring their claims."  [#35 at 4].  While Defendant invites the court to entertain its factual arguments by attaching the Meza Declaration to

its Motion to Dismiss and the Expert Report of Miles Smart in its Reply, it appears that the disputed jurisdictional facts, e.g., whether Swift Beef continues to violate the Permit[2] and whether its discharge adversely affected the riparian environment or Plaintiffs' enjoyment of such environment, are intertwined with the merits of the case.[3]   Accordingly, if this court were to consider this a factual attack, it would be required to convert the Rule 12(b)(1) motion into a Rule 12(b)(6) motion or one for summary judgment if it intended to resolve the disputed facts.  *See Holt*, 46 F.3d at 1003.  This court declines to do so at this juncture of the case, particularly given Plaintiffs' argument that it has not had an opportunity to take any discovery including but not limited to the deposition of Dr. Smart or designating an expert of its own.  *See Sizova v. Nat. Institute of Standards & Tech.*, 282 F.3d 1320, 1326. (10th Cir. 2002) (observing that while a district court has wide discretion in the way it resolves a challenge to subject matter jurisdiction, refusal to grant discovery constitutes an abuse of discretion if it prejudices a litigant).

## II.    Record Before the Court

### A.    Motion to File Sur-Reply

Before turning to the substantive arguments of Defendant's Motion to Dismiss, this court considers the record before it, beginning with whether Plaintiffs should be permitted to file a Sur-reply.  Neither the Federal Rules of Civil Procedure nor this District's Local Rules of Civil Practice allow for Sur-replies as a matter of right.  In the Tenth Circuit, "[a] district court must

---

[2] As discussed at greater length below, the Meza Declaration and its assertions of Swift Beef's compliance in 2019 are not *ipso facto* dispositive of Plaintiffs' claims. Indeed, assuming that Swift Beef was in compliance at the time the Complaint was filed, a factual question remains whether— as Plaintiffs' allege—Swift Beef is likely to continue to violate its permit in the future in the absence of a workable solution to the problems causing Swift Beef's violations.

[3] "[T]he underlying issue [in determining whether the jurisdictional question is intertwined with the merits] is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim."  *Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005).

permit a surreply where it relies on new materials—i.e., new evidence or new legal argument—raised in a reply brief." *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, No. 06-cv-00037-PAB-CBS2010 WL 420046, at *10 (D. Colo. Feb. 1, 2010) (citing *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006)). "However, where the materials are not new or a court disregards any materials that are, that court need not permit a surreply." *Id.* (citing *Green v. New Mexico*, 420 F.3d 1189, 1196-97 (10th Cir. 2005)).

Here, Plaintiffs assert that Swift Beef's "untimely argument" raised on Reply "improperly denies Plaintiffs the opportunity to address the implications of a factual argument that Plaintiffs lack standing due to what Defendant characterizes as the small environmental impact to the South Platte River." [*Id.*]. In Response to the Motion for Leave to File Sur-reply, Swift Beef argues that "[i]t was not until Swift Beef received the Declarations attached with Plaintiffs' Brief in Opposition to Motion to Dismiss that it learned of the specific, limited geographic area of concern and the alleged harm," and therefore "Swift Beef does not raise a new argument, it simply provides more specific evidence to support its original argument that Plaintiffs fail to allege and prove concrete, particularized injury that is traceable to Swift Beef. This argument was raised in the Motion to Dismiss." [#38 at 2].

Swift Beef's supporting citations in its Response underscore the fact that its Motion to Dismiss was a facial challenge to the Complaint. [#38 at 2-3 (excerpts from [#20] repeatedly referencing Plaintiffs' failure to allege standing)]. Having determined that it is more appropriate to proceed with a facial challenge at this juncture, this court will not consider the factual assertions made by Mr. Meza or Dr. Smart, and accordingly the Sur-Reply is unnecessary. Accordingly, Plaintiffs' Motion for Leave to File Sur-reply is **DENIED**.

### B.    Plaintiffs' Declarations

The court also considers whether it is permitted to consider the Declarations offered by Plaintiffs in Response to the Motion to Dismiss.  These member declarations and affidavits seek to clarify the more general factual allegations in their Complaint, detailing the members' respective past and planned recreational and aesthetic enjoyment of Lone Tree Creek, the South Platte River, and the confluence of the two waterbodies, and the manner in which the members experience diminished enjoyment of the area as a result of their knowledge and concern regarding the effluent discharge from the nearby Lone Tree Facility.  *See* [#27-2; #27-3; #27-4].

Notwithstanding the facial nature of Swift Beef's attack on Plaintiffs' Complaint, the court may still properly consider the declarations and affidavits proffered by Plaintiffs in their Response to the instant Motion.  "In evaluating a plaintiff's standing at the motion to dismiss stage, a court may consider not only the allegations in the complaint, but also factual averments made by declaration or affidavit" without converting the motion into a factual attack or a motion for summary judgment.  *See American Tradition Institute v. Colorado*, 876 F. Supp. 2d 1222, 1232 (D. Colo. 2012).  The Supreme Court explained in *Warth v. Seldin* that,

> [in] ruling on a motion to dismiss for want of standing, [courts] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.  At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.  If, after this opportunity, the plaintiff's standing does not adequately appear from *all materials of record*, the complaint must be dismissed.

422 U.S. at 501-02 (emphasis added).  *See also Sac & Fox Nation of Mo. v. Pierce*, 213 F.3d 566, 573 (10th Cir. 2000) ("The [plaintiff]'s uncontroverted affidavits, albeit conclusory, support their allegations of injury . . . [A] plaintiff may submit affidavits to particularize allegations of fact in support of its standing."); *Am. Tradition Institute*, 876 F. Supp. 2d at 1233 ("The Court finds it appropriate [in deciding a motion to dismiss for lack of standing], at this early stage of the

proceedings, to consider and accept [plaintiff]'s declaration as clarification of the general allegations of injury and standing made in the operative Complaint.").

## III.   Standing

Having framed the analysis and defined the record before it, this court now turns to considering whether Plaintiffs sufficiently plead facts, taken as true and viewed in the light most favorable to them, to establish standing.  In the plain language of the citizen suit provision Plaintiffs must merely allege sufficient facts that allow a factfinder to conclude that Swift Beef is "in violation" of its Permit.  *See* 33 U.S.C. §§ 1365(a), 1365(f)(6).  And the Supreme Court has held that for purposes of § 1365 a company remains "in violation" of its Permit if there is "a reasonable likelihood that a past polluter will continue to pollute in the future."  *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 57 (1989); *see also id.* at 69 ("When a company has violated an effluent standard or limitation, it remains . . . 'in violation' of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation.") (Scalia, J., concurring).

Swift Beef argues that dismissal is proper because "Plaintiffs have not alleged facts sufficient to demonstrate that the claimed permit violations are the cause of any particular injury." [#20 at 2].  Swift Beef also argues that the Complaint fails to adequately allege a geographic nexus because "the actual area of the alleged harm is unclear."  [#20 at 12].  While noting Plaintiffs' allegations that the Lone Tree Facility discharges into the Lone Tree Creek . . . [which] then flows approximately one mile to the South Platte River," Swift Beef argues that Plaintiffs fail to allege any damage caused by the Lone Tree Facility effluent to either Lone Tree Creek or the South Platte River.  [*Id.*].  Swift Beef also argues that "the only allegations of proximity" are found in paragraph 9 of the Complaint, wherein Plaintiffs allege that their members "use and enjoy the waters of Lone

Tree Creek and the South Platte River as well as the aquatic environment and dependent wildlife associated with these waterways." [*Id.* at 13; #1 at ¶ 9].

### A.     Concrete and Particularized Injury Fairly Traceable to Defendant's Conduct

The court now turns to the substantive question of whether Plaintiffs have constitutional standing to bring this action.   Swift Beef's arguments related to injury-in-fact are closely intertwined with its arguments regarding traceability.   Accordingly, I consider the two first two elements of Article III standing together.

### 1.     Standard

"The relevant showing for purposes of Art. III standing . . . is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter as part of the standing inquiry is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit." *Friends of the Earth v. Laidlaw Environ. Servs.*, 528 U.S. 167, 181 (2000).  "A person who has reasonable concerns about pollution suffers injury in fact when their concerns directly affect their recreational, aesthetic, or economic interests." *Utah Physicians for a Healthy Env. v. Diesel Power Gear LLC*, 374 F. Supp. 3d 1124, 1132 (D. Utah 2019); *see also Laidlaw*, 528 U.S. at 183-85.  "The proper focus is on *whether* the plaintiff was harmed, not on the amount of harm to the environment," *Nat. Res. Def. Council v. Vilsack*, No. 08-cv-2371-CMA, 2011 WL 3471011, at *4 (D. Colo. Aug. 5, 2011), and a plaintiff's "injury [need not] meet some threshold of pervasiveness to satisfy Article III," *Am. Humanist Ass'n v. Douglas Cty. Sch. Dist.*, 859 F.3d 1243, 1253 (10th Cir. 2017).

Nevertheless, to establish the existence of an "injury in fact," "a plaintiff must offer something more than the hypothetical possibility of injury." *Colorado Outfitters II*, 823 F.3d at 544.  Instead, the alleged injury must be "concrete, particularized, and actual or imminent." *Id.*

(citing *Lujan*, 504 U.S. at 560).  Where a plaintiff seeks prospective relief like an injunction, the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future.  *See Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.,* 765 F.3d 1205, 1211 (10th Cir. 2014).

<h3 style="text-align:center">2.      Plaintiffs' Allegations & Parties' Arguments</h3>

In their Complaint, Plaintiffs allege that Swift Beef has systematically violated the CWA at its Lone Tree Facility by exceeding the limits of its CWA Permit and "[m]embers of both the Center for Biological Diversity and Food & Water Watch use and enjoy the waters of Lone Tree Creek and the South Platte River as well as the aquatic environment and dependent wildlife associated with these waterways for aesthetic enjoyment and recreational activities, including fishing, hunting, swimming, boating, bird and wildlife viewing, hiking, and walking; they intend to continue to do so."  [#1 at ¶ 9].  Plaintiffs further aver that Swift Beef's non-compliance with the Permit's terms "injure members that engage in these recreational and aesthetic uses and deter and limit their uses and enjoyment of these places now and in the future."  [*Id.*].

***Particularized Injury to Plaintiffs***.  In its Motion to Dismiss, Swift Beef initially argues that Plaintiffs' allegations of injury are vague and conclusory.  [#20 at 8].  In Response, Plaintiffs provide declarations from multiple members detailing the members' respective past and planned recreational and aesthetic enjoyment of Lone Tree Creek, the South Platte River, and the confluence of the two waterbodies, and the manner in which the members experience diminished enjoyment of the area as a result of their knowledge and concern regarding the effluent discharge from the nearby Lone Tree Facility.  *See* [#27-2; #27-3; #27-4].  Plaintiffs contend that their members' diminished enjoyment is based on reasonable concerns because (a) "[v]iolations of WET limits reflect the adverse effects of Swift Beef's saltwater discharges on a freshwater aquatic

system,"; and (b) Swift Beef "still cannot neutralize the salty wastewater" from the Lone Tree Facility and does not have a workable solution in place to comply with its WET permit limits. [#27 at 30].  Plaintiffs also allege that, at least at certain times of the year, the entirety of the Lone Tree Creek flow is from the effluent discharge of the Lone Tree Facility.  "[T]he [Lone Tree Facility's] effluent discharges make up almost all of Lone Tree Creek's flow into the South Platte," [#27-1 at 103, 110, 111], "and its discharge point is about a mile for the South Platte River confluence." [#27 at 26].  Plaintiffs explain that Swift Beef's "salt recovery system . . . remains ineffective and cannot operate legally: there is no permit for the air scrubber, it frequently breaks down and is inefficient, the system violates opacity limits when operating, and the system needs an upgrade to work properly." [#27 at 30; #27-1; #1 at ¶¶ 5, 32–39, 62].  Thus, "[w]ithout a solution in place, Plaintiffs' members reasonably believe that the area they use and enjoy will remain polluted with the [Lone Tree Facility's] toxic wastewater discharges." [#27 at 30 (citing [#1 at ¶¶ 5, 9, 62])].

In Reply, Swift Beef argues that the Eubank, Ukeiley, and Nichols Declarations "contain nothing more than abstract references to hypothetical future harm" and thus no "particular and concrete . . . injuries are even alleged."  [#35 at 8].  According to Swift Beef, "[t]he question before the Court has now been limited to whether Plaintiffs will suffer injury on the South Platte River as a result of the potential future unlawful discharges from the Lone Tree Facility three miles upstream." [#35 at 8].  Swift Beef also argues that "there are no allegations of 'environmental effects' as a result of the Swift Beef discharge," [#35 at 9], and contends that "Plaintiffs' concerns are not 'reasonable' here because of the negligible impact of the Lone Tree Creek on the South Platte River."  [#35 at 12].  "The common thread linking all three of Plaintiffs' members is that none of them could cite to a single, identifiable effect of the Lone Tree Creek discharge on the

South Platte River." [#35 at 11].  Defendant argues that, if this were sufficient for standing, "any person could establish standing for wholly past violations as long as they have been to the area at any time and believe – without any basis in science or reality – that there could be harm to the environment if a permit holder were to violate a permit in the future."  [#35 at 12].

While this court agrees that the Complaint's initial allegations were too conclusory to sustain standing, in their Declarations, Messrs. Ukeiley and Nichols have claimed that their enjoyment of various activities they take part in on Lone Tree Creek and waterways downstream is lessened due to Swift Beef's alleged violations of various provisions of the CWA.  I find these sufficient to state a cognizable particularized injury to Plaintiffs.  *See Ecological Rights Found. v. Pacific Lumber*, 230 F.3d 1141, 1152 (9th Cir. 2000); *Vilsack*, 2011 WL 3471011, at *5 (finding the argument that plaintiffs failed to state a particularized injury unpersuasive, where declarants have sufficiently described injuries to their personal aesthetic, recreational and economic interests in declarations in response to motions to dismiss).  The court now turns to Swift Beef's other arguments regarding whether Plaintiffs have standing to bring this action.

***Geographic Nexus.***  Next, Swift Beef argues that the effluent discharge from the Lone Tree Facility occurs too far upstream to have any impact on the South Platte River, and therefore argues that Plaintiffs' lack the requisite "geographical nexus" to support standing.  [#35 at 15].  Swift Beef relies nearly exclusively on the report of Dr. Smart for this proposition.  "[B]ecause there is negligible impact on the South Platte River from the effluent, Plaintiffs cannot reasonably base any fear of future injury on the Facility's effluent discharge."  [#35 at 19].  And on Reply, Defendant challenges whether Plaintiffs' have adequately proven "injury-in-fact" for purposes of standing on the basis that Plaintiffs have not shown injury to the South Platte River; in other words,

Defendant challenges Plaintiffs' assertion that their interests in recreating on the South Platte River are injured by Defendant's discharge into the Lone Tree Creek.

For purposes of standing, however, the fact that the discharge occurred upstream and in a tributary of the South Platte River does not mean that the South Platte River fails to be an "affected area" for purposes of a plaintiff's direct nexus.  Generally,

> environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.' *Friends of the Earth,* 528 U.S. at 183, 120 S. Ct. 693 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S. Ct. 1361, 31 L.Ed.2d 636 (1972)). 'While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.' *Summers,* 555 U.S. at 494, 129 S. Ct. 1142.

*Palma,* 707 F.3d at 1155.  By asserting that Plaintiffs lack a geographical nexus to the alleged harm, Swift Beef challenges whether the South Platte River is an "affected area", thereby challenging both Plaintiffs' assertion of injury-in-fact and traceability.  Here, however, Swift Beef concedes that effluent discharge from its Lone Tree Facility contribute salt (or total dissolved solids ("TDS")) to the South Platte River.  [#35 at 6, 17].  At this juncture, the fact that Swift Beef "*contributes* to the kinds of injuries alleged in the specific geographic area of concern," *WildEarth Guardians v. Colorado Springs Utilities Bd.*, No. 17-cv-00357-CMA-MLC, 2018 WL 317469, at *7 (D. Colo. Jan. 8, 2018), even if its contributions "constitute only a tiny fraction" of Plaintiffs' injury, *Renewable Fuels Assoc. v. United States E.P.A.*, 948 F.3d 1206, 1234 (10th Cir. 2020), is all Plaintiffs need demonstrate.

Moreover, Plaintiffs may rely on "circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper I,* 204 F.3d at 163.  To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit

limitations[,]" thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163-64.

Upon consideration, I find that the South Platte River and its confluence with Lone Tree Creek are "affected areas" and support Plaintiffs' injury-in-fact that is fairly traceable to Swift Beef's effluent discharges for purposes of Article III standing. Swift Beef concedes that the Lone Tree Creek is a tributary of the South Platte River, that it flows into the South Platte River, and that Swift Beef's discharged effluent from the Lone Tree Facility—via the Lone Tree Creek—contributes TDS to the South Platte River. "[T]he proximity of [the South Platte River] to the point of discharge supports the conclusion that discharge violations into [Lone Tree Creek] affect [the South Platte River]." *Ohio Valley Environmental Coalition, Inc. v. Marfork Coal Co., Inc.*, 966 F. Supp. 2d 667, 673-74 (S.D.W.Va. 2013). "By [Swift Beef]'s own estimate, Plaintiffs' use of [the South Platte River] is at an area approximately 3.[07] miles from the [Lone Tree Facility]." *See id.* at 673-74; [#35 at 17]. "This relatively short distance and the fact that [Lone Tree Creek] runs directly into [the South Platte River]," and the fact that at least sometimes discharge from the Lone Tree Facility makes up most of the flow of Lone Tree Creek, "is circumstantial evidence that supports the conclusion that [the South Platte River] is an 'affected area.'" *Marfork Coal*, 966 F. Supp. 2d at 674. *Cf. Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.,* 95 F.3d 358, 361 (5th Cir. 1996) (finding plaintiffs' claims too attenuated where they used a body of water "located three tributaries and 18 miles" downstream from the defendant's refinery); *see also Friends of the Earth, Inc. v. Chevron Chem. Co.,* 900 F.Supp. 67, 75 (E.D. Tex. 1995) (concluding that a distance of two to four miles between source of pollution and waterway used by plaintiffs was not too great to infer causation); *Gaston Copper*, 263 F. App'x 348, 355-56 (4th Cir. 2008) (holding that

plaintiffs had standing because of their recreational and aesthetic interests in area downstream of water pollution discharges).

*Causation.*   On Reply, Swift Beef argues that Plaintiffs fail to establish traceability for purposes of constitutional standing because the Plaintiffs fail to prove "that Swift Beef's discharge had a toxic effect on *this* freshwater ecosystem (the South Platte River) and that the toxic effect somehow impacted their members."   [#35 at 19].   Swift Beef contends that "the only evidence before the Court is that there is almost no measurable or observable impact whatsoever to the South Platte River by the time the Lone Tree Creek discharge reaches the South Platte River."   [#35 at 19].   But on a facial challenge to subject matter jurisdiction, I must disregard Defendant's proffered expert testimony regarding the "negligible" impact of the Lone Tree Creek effluent on the South Platte River.

"In the context of an environmental pollution case, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kind of injuries alleged in the specific geographic area of concern."   *WildEarth Guardians*, 2018 WL 317469, at *7.   As discussed above, at this juncture, the allegation that Swift Beef "*contributes* to the kinds of injuries alleged in the specific geographic area of concern," *id.,* even if its contributions "constitute only a tiny fraction" of Plaintiffs' injury, *Renewable Fuels*, 948 F.3d at 1234, is all Plaintiffs needs to plead.

"Whether a court can infer a causal link between a source of pollution and at least some portion of a petitioner's injury is a fact-specific inquiry that turns on many factors, including the size of the waterway, the proximity of the source and the injury, forces like water currents, and whether discharges will evaporate or become diluted." *Center for Biological Diversity v. EPA* (5th Cir. 2019) (citing *Crown Central*, 95 F.3d at 361-62).   Here, the Lone Tree Creek is low-flowing

and by Swift Beef's own admission, at times nearly entirely comprised of effluent from the Lone Tree Facility.  *See* [#35 at 4-5].  Moreover, the Lone Tree Facility is 3.07 miles from the South Platte River, and the declarants testify to their diminished enjoyment not only on the South Platte River, but at the confluence of Lone Tree Creek and the South Platte River.  And it is undisputed that Lone Tree Creek is a tributary of the South Platte River; it flows directly into the South Platte.

***Ongoing Violation***.   Finally, the court considers Swift Beef's contention that it has complied with the terms of the Permit at and since the time that the Complaint was filed.  Swift Beef contends that the "Complaint does not allege that Swift Beef is violating its permit" because it "does not allege any violations in 2019 or that Swift Beef was out of compliance at the time the Complaint was filed." [#20 at 8].  According to Defendant, "Plaintiffs' allegations regarding causation are conclusory in nature and lack any specificity or traceability between the historic permit violations and any current impact on Plaintiffs' recreational activities." [#20 at 8].  Swift Beef argues that "[t]raceability requires a party to plead and demonstrate how the violations 'deter and limit' their uses and enjoyment," and Plaintiffs have not met this required showing because "[t]here are no allegations that the claimed [permit] violations impacted any wildlife, vegetation, waterways, etc."  [*Id.*].  "At the very least," argues Swift Beef, "Plaintiffs should be required to allege what harm to the environment was caused by the claimed permit violations and how that harm impacted the members of Plaintiffs' organizations."  [*Id.* at 8-9].[4]

Swift Beef also relies heavily on two unpublished opinions from this District.  *See Ctr. for Bio. Diversity v. Norton*, No. 02-cv-435-WDM-MJW (D. Colo. Sept. 30, 2003); *Ctr. for Bio. Diversity v. Norton ("Norton II")*, 02-cv-435-WDM-MJW, 2005 WL 1994251 (D. Colo. Aug. 17,

---

[4] To the extent Swift Beef's argument here is couched in Rule 12(b)(1) terms, for the reasons discussed above, this court (a) finds that Plaintiffs have sufficiently demonstrated standing, and (b) is satisfied that this court has subject matter jurisdiction over the instant action.

2005).  Swift Beef argues that, like in *Norton*, the Complaint here "suffers from the same fatal defect" because "Plaintiffs make the conclusory statement that its [sic] members have been injured by Swift Beef's <u>historic</u> permit violations." [#20 at 10 (emphasis added)].

I find Swift Beef's argument in this regard unpersuasive for several reasons.  First, *Norton* is not as instructive as Swift Beef claims.  In *Norton*, the plaintiffs sought to challenge the Secretary of the Department of the Interior and the Bureau of Land Management's inaction under the Wild and Scenic Rivers Act ("WRSA").  *See Norton II*, 2005 WL 1994251, at **1-2.  There, the court found that the plaintiffs had failed to demonstrate any "injury, real or threatened; or even any past harm likely to recur," as a result of the defendants' failure to (a) make specific studies and investigations regarding potential additions to the WSRA and (b) give consideration to potential wild and scenic river areas in planning for the use and development of resources.  *Id.* at *2.  There were no specific discharges or projects alleged to have caused any injury; in essence, the plaintiffs lacked standing to challenge *agency inaction* under the WRSA.

Here, Plaintiffs do not merely allege wholly past violations of Swift Beef's Permit.  Instead, Plaintiffs allege that—in light of previous violations *and a lack of a workable solution to the problem causing Swift Beef's violations*—"there is a continuing likelihood of recurring, intermittent, or sporadic violations." [#27 at 20; #1 at ¶¶ 5, 32-39, 62].  *See also* [#27 at 21 ("Violations are wholly past if risk of a recurring violation 'has been completely eradicated when citizen-plaintiff filed suit.'") (quoting *Chesapeake Bay*, 844 F.2d at 172)].  Notwithstanding Swift Beef's contention that it is no longer violating its WET test effluent limits, it is undisputed that for at least five consecutive years, Swift Beef has been discharging its Lone Tree Facility effluent into Lone Tree Creek in excess of its Permit.  *See Ctr. for Bio. Div. v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019) ("In a case involving a small body of water, close proximity, well-understood water currents,

and persistent discharges, [finding a causal link between a source of pollution and at least some portion of a plaintiff's injury] might be appropriate.") (citing *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996)); *cf. Vilsack*, 2011 WL 3471011, at *3. Plaintiffs further contend that despite the operation of the salt recovery system by December 2017, Swift Beef continued to violate the Permit's WET testing limits in each quarter of 2018, thereby raising the issue of whether the salt recovery system was operating properly.[5] [#1 at ¶¶ 37-38, #27 at 7]. Courts in this District have allowed a plaintiff to prove an ongoing violation in order to establish jurisdiction "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Cripple Creek & Victor Gold Min. Co.*, No. 00-CV-02325-MSK-MEH, 2006 WL 2882491, at *11 (D. Colo. Apr. 13, 2006). While Defendant may be able to establish factually that these assertions are incorrect, this court is satisfied that Plaintiffs have adequately pleaded injury-in-fact, traceability, and a good faith basis for intermittent violations. *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1139 (10th Cir. 2005) (observing that "for purposes of Article III standing, to establish jurisdiction, citizen-plaintiffs need only make good-faith allegations of continuous or intermittent violations").

### B.    Redressability

I turn next to consider whether Plaintiffs have sufficiently established redressability, the third and final requirement of Article III standing. "To demonstrate redressability, a party must

---

[5] Plaintiffs also allege that Defendant's modified Air Pollutant Emission Notice and modified construction permit have not been granted [#1 at ¶ 39], but it is unclear to this court how any potential violation of the Clean Air Act, though concerning, is relevant to the claims asserted in this action. There are no allegations that Swift Beef has been ordered to shut down the salt evaporation system or that it is non-functional without these modified permits. *See generally* [#1].

show that a favorable court judgment is likely to relieve the party's injury." *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174, 1182 (10th Cir. 2012) (quoting *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1264 (10th Cir. 2011)).

Apart from its other arguments regarding standing, Swift Beef does not raise distinct redressability arguments in its Motion to Dismiss. *See generally* [#20]. Plaintiffs explain that their injuries are redressable by the relief sought, which includes declaratory and injunctive relief and civil penalties. [#27 at 33]. Plaintiffs argue that (a) a declaratory judgment is "powerful relief" because Swift Beef has maintained systemic noncompliance with its WET limits and has not conceded liability; (b) an injunction prohibiting Swift Beef "from piping salty wastewater to the [Lone Tree Facility]"—or otherwise requiring Swift Beef to prevent its salty discharges from causing WET violations—"will redress the concern that has diminished Plaintiffs-members' enjoyment of the South Platte River's freshwater environment"; and (c) "civil penalties will promote immediate compliance and deter Swift Beef's illegal conduct." [#27 at 34].

In Reply, Swift Beef appears to argue that given its recent compliance with the Permit, there is no benefit of deterrence to be gained from the imposition of civil penalties under the CWA. [#35 at 21 ("The company has installed and is operating a system that has been in compliance with the Permit for over a year. How could a civil penalty at this point make any difference at all?")]. Again, Swift Beef asks the court to conflate the merits question (whether Swift Beef is in "continuing violation" of its Permit), with the jurisdictional question (whether, *assuming Swift Beef is violating its Permit as alleged*, the Plaintiffs' injuries are redressable by the court). But as the Supreme Court in *Laidlaw* explained, "[t]o the extent that [civil penalties] encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to plaintiffs who are injured or threatened with injury as a consequence of ongoing

unlawful conduct." 528 U.S. at 186. *See also Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1273 (10th Cir. 2018) (civil penalties under the CWA will "deter future violations"). Accordingly, this court finds that Plaintiffs have sufficiently pleaded redressability of their injuries and, thus, have satisfied the requirements of Article III standing.

## IV.     Failure to State a Claim

Having determined that federal subject matter jurisdiction is properly exercised in this action via the foregoing Rule 12(b)(1) analysis, I turn briefly to whether Plaintiffs have stated a cognizable claim to survive dismissal pursuant to Rule 12(b)(6). As with the facial attack to subject matter jurisdiction, when considering whether Plaintiffs have stated a cognizable claim, the court is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Evans v. Diamond*, 957 F.3d 1098, 1100 (10th Cir. 2020) (ellipsis omitted) (quoting *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010)).

To state a claim under the CWA's citizen suit provision, a complaint must allege: (1) that the plaintiff has an interest that is or may be adversely affected; (2) by an individual entity, or state's; (3) ongoing; (4) violation of an effluent standard or limitation. *Swartz v. Beach*, 229 F. Supp. 2d 1239, 1268-69 (D. Wyo. 2002). Swift Beef does not make distinct arguments for dismissal under Rule 12(b)(6) beyond its facial attack to Plaintiffs' standing. Thus, for the reasons set forth above, I find that Plaintiffs have adequately stated a claim for relief under the CWA. Accordingly, Swift Beef's Motion to Dismiss is **DENIED** in its entirety. In so finding, this court notes that at summary judgment or at trial, Plaintiffs will not be able to simply rely upon allegations but will have to prove their various assertions, including but not limited to that the violation is ongoing, either by being continuous or intermittent, and Plaintiffs are suffering an injury-in-fact

that is caused by Defendant.  *Cf. Cripple Creek & Victor Gold Min. Co.*, 2006 WL 2882491 (reflecting the trial court's findings of fact, conclusions of law, and judgment on alleged CWA violations after a seven-day bench trial).

### CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)     Defendant's Motion to Dismiss [#20] is **DENIED**;

(2)     Plaintiffs' Motion for Leave to File a Sur-reply [#37] is **DENIED**; and

(3)     The Parties shall jointly contact chambers via email at Wang_Chambers@cod.uscourts.gov within three days of this ruling to set a supplemental Scheduling Conference.

DATED: June 2, 2020                          BY THE COURT:

                                             _____
                                             Nina Y. Wang
                                             United States Magistrate Judge