IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-01464-NYW

CENTER FOR BIOLOGICAL DIVERSITY and
FOOD & WATER WATCH,

      Plaintiffs,

v.

SWIFT BEEF COMPANY,

      Defendant.

---

## CONSENT DECREE AND ORDER

---

Upon consideration of the Parties' Joint Motion for Entry of Consent Decree and Order, before the taking of any further testimony, without further adjudication or admission of any issue of fact or law, and with the consent of the Parties, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.      BACKGROUND

A.      Plaintiffs Center for Biological Diversity and Food & Water Watch brought this action against Defendant Swift Beef Company alleging certain violations of the Federal Water Pollution Control Act, otherwise known as the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act"), arising from Defendant's operations of the Lone Tree Wastewater Treatment Facility in Greeley, Colorado;

B.      Plaintiff Center for Biological Diversity ("Center") is a non-profit, public benefit corporation organized under the laws of the State of California, dedicated to the preservation of biodiversity, native species, and ecosystems;

C.      Plaintiff Food & Water Watch ("FWW") is a non-profit, public benefit corporation organized under the laws of the District of Columbia that mobilizes people to build

political power to move bold solutions to the most pressing food, water, and climate problems of our time. FWW uses grassroots organizing, policy advocacy, research, communications, and litigation to protect people's health, communities, and democracy;

D.    Swift Beef Company ("Swift Beef" or "Defendant") is a corporation organized and existing under the laws of the State of Delaware and authorized to conduct business in the State of Colorado;

E.    At all times relevant here, Swift Beef has owned and operated a beef processing plant ("Beef Plant") located at 800 North 8th Avenue, Greeley, Colorado 80632;

F.    Swift Beef currently owns a former lamb processing plant ("Lamb Plant") located at 920 North 7th Avenue, Greeley, Colorado 80631;

G.    At all times relevant here, Swift Beef has owned and operated the Lone Tree Wastewater Treatment Facility ("Facility") located at located at 24750 Weld County Road 62 ½, Greeley, Colorado 80631;

H.    On October 9, 2012, the Colorado Department of Public Health and Environment ("CDPHE") issued Swift Beef a discharge permit, Permit No. CO-0027707 ("Water Permit"), pursuant to the Colorado Water Quality Control Act, C.R.S. 25-8-101 *et seq*, under the authority vested to the State under the Clean Water Act, 33 U.S.C. § 1342 *et seq.* The Water Permit authorizes Swift Beef to discharge treated Facility wastewater, originating from the Beef Plant and Lamb Plant, to Lone Tree Creek, a tributary of the South Platte River, subject to the specific effluent limitations and other conditions;

I.    CDPHE administratively extended the Water Permit, which was set to expire five years after issuance, on December 1, 2017;

J.    The Water Permit includes, among other things, effluent limitations on Whole Effluent Toxicity ("WET") and ammonia;

- 2 -

K.      On January 31, 2019, Plaintiffs issued a notice of intent to sue letter to Swift Beef (the "CWA NOI") for alleged violations of the CWA (Attached as Exhibit A). The CWA NOI includes Plaintiffs' allegations that Swift Beef violated certain conditions relating to WET standards, ammonia limits, and associated compliance response and monitoring requirements as contained in the Water Permit. The letter was concurrently served on the Administrator of the U.S. Environmental Protection Agency, ("U.S. EPA"), the Regional Administrator of the U.S. EPA for Region 8, and the Attorney General of the United States;

L.      On May 23, 2019, Plaintiffs initiated the above-captioned action against Swift Beef, alleging violations of the CWA, as identified in the CWA NOI letter, and seeking declaratory and injunctive relief, the imposition of civil penalties, and Plaintiffs' litigation costs, including attorneys' fees and costs ("Complaint");

M.      Plaintiffs served the Complaint in this matter upon Swift Beef, the Administrator of the U.S. EPA, the Regional Administrator of the U.S. EPA for Region 8, and the Attorney General of the United States as required under 40 C.F.R. § 135.4;

N.      On July 24, 2020, the Center and FWW issued a supplemental notice of intent to sue letter to Swift Beef (the "Supplemental CWA NOI"), alleging violations of WET and ammonia limits that post-dated the Complaint (Attached as Exhibit B). Plaintiff served the same concurrently on the Administrator of the U.S. EPA, the Regional Administrator of the U.S. EPA for Region 8, and the Attorney General of the United States;

O.      On August 6, 2020, CDPHE's Water Quality Control Division issued Swift Beef a Notice of Violation and Cease and Desist Order due to alleged 2020 WET and ammonia violations, (Attached as Exhibit C), as identified in Plaintiffs' July 24, 2020 Supplemental CWA NOI. Among other things, CDPHE's Notice of Violation and Cease and Desist Order required Swift

Beef to retain a third-party consultant experienced in industrial wastewater treatment and management;

P.      In accordance with CDPHE's Notice of Violation and Cease and Desist Order, Swift Beef retained the services of Woodard & Curran.  Woodard & Curran evaluated the Lone Tree Facility for the purpose of identifying ways to improve the Facility and ensuring future and long-term compliance with the terms and conditions of the Water Permit.  On November 4, 2020, Woodard & Curran issued a report that identifies several corrective measures, including for upgrades to instrumentation and process controls at the Facility.  The November 4, 2020 report is incorporated into this Consent Decree and attached as Exhibit D;

Q.      On July, 20, 2015, CDPHE issued Swift Beef an air permit, Permit No. 95WE757 ("Air Permit"), pursuant to the Clean Air Act and the Colorado Air Pollution Prevention and Control Act, C.R.S. § 25-7-101 *et seq.* and under the authority vested to the State under the Clean Air Act's State Implementation Program, 42 U.S.C. § 7410 *et seq.*, which governs air emissions from the Plant and its various points of emission, including emissions from the salt recovery system (Emission Point 20), subject to specific limitations and other conditions;

R.      On July 23, 2018, Swift Beef applied for a modification to its Air Permit with CDPHE to include a wet scrubber for its salt recovery system (Emission Point 20).  Among other things, Swift Beef's application states that the wet scrubber's "operation began on" date for the purposes of Swift Beef's application was February 12, 2018;

S.      On October 1, 2019, Plaintiff issued a notice of intent to sue letter to Swift Beef (the "CAA NOI") for alleged violations of the Clean Air Act, 42 U.S.C. § 7401 *et seq.* and served same on the Administrator of the U.S. EPA, the Regional Administrator of the U.S. EPA for Region 8, and the Attorney General of the United States (Attached as Exhibit E);

T.     The CAA NOI alleged that Swift Beef violated certain conditions of its Air Permit relating to Swift Beef's operation of a salt evaporator system at its Beef Plant (Emission Point 20), triggered by the date the wet scrubber began operating pursuant to the Air Permit application (as referenced in paragraph R above), including for failing to give notice of startup, failure to conduct initial compliance testing, failure to provide an operating and maintenance plan, failure to provide certain specifications of the salt evaporator, failure to properly self-certify the salt evaporator, failure to properly provide fuel consumption limits for the salt evaporator, and failure to certify compliance with emission limits for criteria pollutants released from the salt evaporator;

U.     On October 29, 2019, CDPHE's Air Quality Control Division issued Swift Beef a Compliance Advisory based on some of the same alleged violations Plaintiffs alleged in their CAA NOI.  On March 26, 2020, CDPHE and Swift Beef entered into a Compliance Order on Consent to resolve the violations identified in the October 29, 2019 Compliance Advisory;

V.     On August 27, 2020, Swift Beef retained the Ramboll Engineering Company to investigate the salt evaporator system utilized at the Beef Plant and evaluate the cause of visible air emissions that at times can exceed allowable opacity limitations and identify a pathway to a solution ("Ramboll Proposal") (Attached as Exhibit F).

W.     On January 20, 2021, Plaintiffs filed a Supplemental Complaint alleging that Swift Beef violated the ammonia limits and WET test limits of its Water Permit, and certain conditions of its Air Permit identified in Plaintiffs CAA NOI ("Supplemental Complaint");

X.     Plaintiffs served the Supplemental Complaint in this matter upon Swift Beef, the Administrator of the U.S. Environmental Protection Agency, ("U.S. EPA") the Regional Administrator of the U.S. EPA for Region 8, and the Attorney General of the United States as required under 40 C.F.R. § 135.4;

- 5 -

Y.      Swift Beef denies the allegations in the Complaint, Supplemental Complaint and violations identified in the CWA NOI, Supplemental CWA NOI and CAA NOI, and alleges that it was in compliance with its Water Permit at the time of the filing of the Complaint and Supplemental Complaint, and has implemented measures both voluntarily and in compliance with regulatory requirements and further agrees to take the actions listed herein under Section III (Requirements) to help ensure compliance with its Air Permit and Water Permit;

Z.      Plaintiffs and Swift Beef (collectively the "Parties") have negotiated this Consent Decree in good faith and at arm's length, and agree that the settlement of the above-captioned action through this Consent Decree without further litigation is in the public interest and is a fair, reasonable, and appropriate means of resolving all claims in this action. Nothing herein shall constitute an admission of liability.

## II.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action and the Parties pursuant to 28 U.S.C. § 1331 and the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365(a) and Clean Air Act, 42 U.S.C. § 7604(a)(1). Venue lies in this District pursuant to 33 U.S.C. § 1365(c)(1) and 42 U.S.C. § 7604(a)(1) because the violations in the Supplemental Complaint are alleged to have occurred in this judicial district. For purposes of this Consent Decree, or any action to enforce this Consent Decree, Swift Beef consents to the court's jurisdiction and venue in this judicial district.

## III. APPLICABILITY

2.      This Consent Decree shall inure to the benefit of, and be binding upon, the Parties and their successors, assigns, officials, agents, representatives, and staff.  Changes in the organizational form or status of a party shall have no effect on the binding nature of this Consent Decree or its applicability.

- 6 -

3.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter herein. Excepts for exhibits attached hereto, no document, representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

4.     This Consent Decree and any injunctive relief ordered within applies solely to Swift Beef's operation and oversight of the Facility and Beef Plant, which are the subjects of the Water Permit and Air Permit, respectively, and the Lamb Plant which is subject to the Water Permit.

## IV.    GENERAL PROVISIONS

5.     This Consent Decree is a full and complete settlement and release of all claims alleged by Plaintiffs in the CWA NOI, the Supplemental CWA NOI, the CAA NOI, the Supplemental Complaint, and all other claims known to exist to Plaintiffs as of the date of entry of this Consent Decree, related to the Facility, the Beef Plant, the Lamb Plant, and Swift Beef's compliance with the Clean Water Act and Clean Air Act, as against Swift Beef, its officers, directors, employees, shareholders, consultants, contractors, or agents.

6.     This Consent Decree is a settlement of disputed facts and law. It is not an admission or adjudication regarding any allegations by Plaintiffs in this case or of any fact or conclusion of law related to those allegations.

7.     This Consent Decree shall constitute a final, non-appealable judgment in this action and shall take effect on the day it is entered by the Court.

8.     In the event that any part of the Consent Decree is deemed by a court of competent jurisdiction to be unlawful, void, or for any reason unenforceable, and if that part is

severable from the remainder of the Consent Decree without frustrating its essential purpose, then the remaining parts of this Consent Decree shall remain valid, binding, and enforceable. The Parties agree an essential purpose of this Consent Decree is a full and complete settlement and release of all claims as described above in Section II., paragraph 5.

9.      If for any reason the Court should decline to approve this Consent Decree in the form presented, the Parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the Court to entry of this Decree.

10.      Each signatory to this Consent Decree certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document. Each party acknowledges and represents that it has relied on the legal advice of its attorneys, who are the attorneys of its own choice, and that the terms of this Consent Decree have been completely explained to the party by its attorneys, and that the terms are fully understood and voluntarily accepted.

11.      This Consent Decree may be signed in counterparts, and each such counterpart, including copies in PDF format, shall be deemed to be an original instrument, and its validity shall not be challenged on that basis.

## V. REQUIREMENTS

12.      Swift Beef shall provide a copy of this Consent Decree to all officers, employees, and agents of Swift Beef whose duties might reasonably include compliance with any provision of this Consent Decree.

13.      Upon entry of this Consent Decree, Swift Beef agrees to the following terms and conditions in full and complete satisfaction of all the claims covered by this Consent Decree:

    a.      Swift Beef shall fully comply with the Water Permit's WET and ammonia limits, and shall comply with any updated, amended, or re-issued Water

Permit for such time as Swift Beef is covered by such Water Permit.  Nothing in this sub-paragraph affects Swift Beef's ability to request that CDPHE terminate the Water Permit's coverage of the Facility as permitted under the terms and conditions of the Water Permit or as otherwise authorized by law.

        b.      Swift Beef shall fully implement the corrective measures provided by Woodard & Curran concerning the Facility, as required by the CDPHE August 6, 2020 Notice of Violation/Cease and Desist Order (attached as Exhibits C and D), and in accordance with paragraph 19 of the same August 6, 2020 Notice of Violation/Cease and Desist Order, which establishes a deadline of May 3, 2021 for implementing the corrective measures, subject to any revisions contemplated thereby.

        c.      Within seven days of receipt from Ramboll Engineering Company, Swift Beef will send Plaintiffs copies of any Performance Assessment (as defined in Exhibit F, Task 4 of the Ramboll Proposal) provided by Ramboll addressing operations at, and air emission from, Swift Beef's salt evaporator system at the Beef Plant. The scope of the Performance Assessment is set forth in the Ramboll Proposal, Task 4.  The Performance Assessment shall be incorporated into this Consent Decree.  Within eighteen (18) months of execution of this Consent Decree, Swift Beef shall fully implement a technically feasible solution strategy identified by Ramboll in the Performance Assessment, which may be a modification of the air scrubber system.

        d.      Upon entry of this Consent Decree and for a period of twenty-seven (27) months or until such time as Swift Beef's Water Permit coverage for the Facility is lawfully terminated, whichever is earlier, Swift Beef shall, no later

than five (5) days following submission of any documents pertaining to compliance with the Water Permit that are required to be provided to CDPHE, provide copies of those documents to Plaintiffs' designated representatives in electronic format.

   e.    Swift Beef shall make a payment, in lieu of a civil penalty authorized under 33 U.S.C. § 1365, in the amount of  $300,000 to the Southern Plains Land Trust for land acquisition along the South Platte River downstream of the Lone Tree Creek confluence for the purpose of ecological protection and enhancement. The $300,000 payment will be made within thirty (30) days after the entry of this Consent Decree, shall be made by check payable to Southern Plains Land Trust, and shall bear the notation "Center for Biological Diversity and Food & Water Watch v. Swift Beef Company Consent Decree," with a copy provided to Plaintiffs at that same time.

   f.    Within fourteen (14) days of entry of this Consent Decree, Swift Beef shall pay Plaintiffs' attorney fees and costs in the amount of $200,000 in full and complete satisfaction of any claims Plaintiffs may have under the Clean Water Act for attorney fees and litigation costs and expenses. Such payment shall be made by check payable to "Public Justice."

14.    In the event of an undisputed violation of the WET or ammonia limits in the Water Permit during the twenty-seven (27) month effective period of this Consent Decree, Swift Beef agrees to stipulated payments in lieu of civil penalties as follows:

   a.    $2,500 each for the first, second, and third violations;

   b.    $5,000 for the fourth, fifth, sixth, seventh, and eighth violations;

   c.    $10,000 for the ninth and subsequent violations.

For the purposes of this section, a WET test failure constitutes one enforceable violation; one thirty (30) day average ammonia violation constitutes one enforceable violation; and one daily ammonia violation constitutes one enforceable violation. For violations, Swift Beef shall have any defenses available to it that exist under the Water Permit, or any successor Water Permit for the discharge of Facility wastewater to Lone Tree Creek, as well as any other defenses that exist under the Clean Water Act. In the event any government agency takes any enforcement action resulting in penalties, a Permit exceedance shall not constitute a violation of this Consent Decree. In the event there are stipulated payments, they shall be paid to Southern Plain Land Trust for land acquisition as described above.

## VI. FORCE MAJEURE

15.    Force Majeure, for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Swift Beef, of any entity controlled by Swift Beef, that delays or prevents the performance of any obligation under this Consent Decree despite Swift Beef's reasonable efforts to fulfill the obligation. The requirement that Swift Beef exercise reasonable efforts to fulfill the obligation includes using reasonable efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the extent reasonably possible. Force Majeure does not include Swift Beef's financial inability to perform any obligation under this Consent Decree.

16.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, Swift Beef shall provide notice within seven (7) days of such event and describe the length or anticipated length of non-compliance, the circumstances causing non-compliance, the measures taken or to be taken to prevent or minimize non-compliance, and a schedule for implementation of the measure to be taken  Provided that Swift Beef complies with the notice provision of this paragraph and Plaintiffs do not timely dispute

Swift Beef's claim of Force Majeure pursuant to Paragraph 18 (or, if disputed, are unsuccessful), then in the event that Swift Beef fails to comply or anticipate failing to comply with the requirements of this Consent Decree because of a Force Majeure event, such failure to comply, as described in the written notice to Plaintiffs under this paragraph, shall not be a violation of this Consent Decree and shall not result in any liability or other sanction.  If such a Force Majeure event delays the time of performance of the obligations in either subparagraph 13(b) or 13(c), the parties shall jointly move the Court to extend the time for compliance with this Decree for the obligations in subparagraph 13(b) or 13(c) to a period equal to the actual delay resulting from such Force Majeure event.

## VII. RETENTION OF JURISDICTION AND DISPUTE RESOLUTION

17.     This Court retains jurisdiction over this matter until termination of this Consent Decree for the purpose of resolving disputes arising under this Decree, enforcing compliance with the terms of this Decree, or entering orders modifying this Decree.  The Parties may apply to the Court for any further order or relief that may be necessary regarding compliance with this Consent Decree.

18.     The Parties agree to appoint the Honorable Michael E. Hegarty of the U.S. District Court for the District of Colorado as special master and any dispute regarding the terms or conditions of this Consent Decree will be submitted to the special master for resolution, and the special master may decide the dispute and award reasonable attorney fees and costs to either party.  The process for resolving disputes is as follows:

> a.    Notice of Dispute. The Party alleging a dispute shall first transmit a "Notice of Dispute" to the other Party, describing the substance of the dispute and proposing a remedy. The recipient of the Notice of Dispute shall have 14 days to respond.

**b.** <u>Tender of Dispute</u>. If the Party alleging a dispute rejects the response of the other Party, or if the other Party fails to respond within fourteen (14) days, then the Party alleging the dispute may tender the dispute to Judge Hegarty for expedited resolution within thirty (30) days. Submission shall be effectuated by e-mail to Judge Hegarty's chambers' email address: "hegarty_chambers@cod.uscourts.gov," with counsel of record for the Parties copied. The other Party shall have fourteen (14) days to respond to the Tendering Party's submission, subject to the same limitations on length. There shall be no replies.

**c.** <u>Resolution of Dispute</u>. Judge Hegarty may request the Parties to appear for a hearing, or to submit additional memoranda or materials, or to take other action(s) as may be appropriate to expediently resolve the dispute between the Parties. Judge Hegarty's resolution of a dispute shall be final and binding upon the Parties. However, Judge Hegarty's resolution of a dispute shall not modify the terms of this Consent Decree. In the event any relief recommended by Judge Hegarty would modify the terms of the Consent Decree, either party may move to amend the Consent Decree by filing the appropriate motion to be heard by Magistrate Judge Wang and the parties maintain all appeal rights.

## VIII. EFFECTIVE DATE

19.    This agreement shall take effect upon entry of the Consent Decree by the Court.

## IX. TERMINATION

20.    Unless otherwise modified by the Court, the provisions of this Consent Decree shall terminate twenty-seven (27) months from the date of entry of the Consent Decree, provided, however, Swift Beef has complied with the requirements in Paragraphs 13(b) and (c)

above. If Swift Beef has not complied with the requirements of Paragraphs 13(b) and (c) above within twenty-seven (27) months from the date of entry of the Consent Decree, then the Consent Decree, except for Paragraphs 13(a), 13(d), and 14, shall remain in effect until such time as the obligations in 13(b) and/or (c) are satisfied.

## X. NOTICES

21.     All notices and other communications regarding this Consent Decree shall be in writing and shall be fully given by mailing via first-class mail, postage pre-paid; by delivering the same by hand; or by sending the same via e-mail to the following addresses, or to such other addresses as the Parties may designate by written notice, provided that communications that are mailed shall not be deemed to have been given until three business days after mailing:

To Plaintiffs:

Neil Levine
Public Justice
4404 Alcott Street
Denver, Colorado 80211
(303) 455-0604
nlevine@publicjustice.org

Daniel C. Snyder
Law Offices of Charles M. Tebbutt, PC
941 Lawrence Street
Eugene, OR 97401
(541) 344-3505
dan@tebbuttlaw.com

Hannah Connor
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
(202) 681-1676
hconnor@biologicaldiversity.org

Tarah Heinzen
Food & Water Watch
36 N Buffalo St.
Portland, OR 97217

- 14 -

(202) 683-2457
theinzen@fwwatch.org

To Swift Beef:

JBS USA Holdings, Inc.
Attn: Legal Department
1770 Promontory Circle
Greeley, CO 80634

Steven P. Case
McGrath North Mullin & Kratz, PC LLO
1601 Dodge St., Ste. 3700
Omaha, NE 68102
Fax: 402-341-0216
Email: scase@mcgrathnorth.com

## XI. PUBLIC STATEMENTS

22.     The Parties shall agree to all language included in any press releases issued in connection with entry of the Consent Decree ("Press Release"), and will not make any statements in a manner that are materially inconsistent with the terms of the Consent Decree or the Press Release.

## XII. MODIFICATIONS

23.     Modifications to this Consent Decree may be made only upon written agreement of the Parties which shall be filed with the Court.

## XIII. NOTICE TO THE UNITED STATES

24.     The Parties recognize that, pursuant to 33 U.S.C. § 1365(c)(3) and 42 U.S.C. § 7604(c)(3), no consent decree can be entered in a Clean Water Act or Clean Air Act citizen suit in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the U.S. Attorney General and the Administrator of the U.S. EPA. Upon execution of this Consent Decree by the Parties, the  Parties shall file this Consent Decree with the Court and Plaintiffs shall simultaneously serve a copy of this Consent Decree, by

certified mail (return receipt requested), on the Administrator of the U.S. EPA, the U.S. Attorney General, and the Regional Administrator for U.S. EPA Region 8. Forty-five (45) days following receipt by the U.S. Attorney General, and the Administrator of the U.S. EPA, the Parties shall submit a joint motion to the Court seeking entry of the Consent Decree.

**WE HEREBY CONSENT TO THE ENTRY OF THIS CONSENT DECREE.**

Dated and entered this_____15th_____day of_____March_____, 2021.

_____
UNITED STATES MAGISTRATE JUDGE
District of Colorado

FOR PLAINTIFF CENTER FOR BIOLOGICAL DIVERSITY:

Date: _1/19/2021_                    _____

Agent Authorized to Accept Service on Behalf of Center for Biological Diversity Relating to this Consent Decree:

Hannah Connor
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
(202) 681-1676
hconnor@biologicaldiversity.org

FOR PLAINTIFF FOOD & WATER WATCH:

Date: 1/19/2021

Agent Authorized to Accept Service on Behalf of Food & Water Watch Relating to this Consent Decree:

Tarah Heinzen
Food & Water Watch
36 N Buffalo St.
Portland, OR 97217
(202) 683-2457
theinzen@fwwatch.org

FOR DEFENDANT SWIFT BEEF COMPANY:

Date: 1/20/2021

_____

Tim Schellpeper
Swift Beef Company
1770 Promontory Circle
Greeley, Colorado 80634
(970) 506-8000

Agent Authorized to Accept Service on Behalf of Swift Beef Relating to this Consent Decree:

Legal Department
Swift Beef Company
1770 Promontory Circle
Greeley, Colorado 80634
(970) 506-8000

- 15 -

# EXHIBIT TABLE

| Exhibit: | Description of the Exhibit: | Section where the Exhibit is defined in the Consent Decree: |
|---|---|---|
| A | January 31, 2019 CWA Notice of Violation and Intent to Sue Letter | I.K. |
| B | July 24, 2020 CWA Supplemental Notice of Violation and Intent to Sue Letter | I.N. |
| C | August 6, 2020 Colorado Department of Public Health & Environment's Notice of Violation and Cease and Desist Order | I.O. |
| D | November 4, 2020 Woodard & Curran Report | I.P. |
| E | October 1, 2019 CAA Notice of Violation and Intent to Sue Letter | I.S. |
| F | August 27, 2020 Ramboll Proposal | I.V. |

# EXHIBIT A



January 31, 2019

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Swift Beef Company
Lone Tree Wastewater Treatment Facility
24750 Weld County Road 62 1/2
Greeley, CO 80631

Andre Nogueira
President and Chief Executive Office
JBS USA
1770 Promontory Circle
Greeley, CO 80634

> Re:  Notice of Violations and Intent to Sue under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*

Through counsel at Public Justice, the Center for Biological Diversity and Food & Water Watch notify you of their intent to file civil litigation against Swift Beef Company and JBS USA over the Lone Tree Wastewater Treatment Facility's serious and ongoing violations of the Clean Water Act (CWA) and its permit (Permit No. CO0027707), which was issued under the CWA and Colorado Water Quality Control Act.  Swift Beef Company and JBS USA are the permittees, owners and/or operators of the Lone Tree Wastewater Treatment Facility (sometimes the "Plant") and are responsible for the Plant's effluent discharges and violations of the Permit's limits and other requirements.  At the expiration of sixty days from the date of this letter, the Center for Biological Diversity and Food & Water Watch intend to file suit under the CWA's citizen suit provision, 33 U.S.C. § 1365, and will seek declaratory and injunctive relief, civil penalties and all other relief authorized by law for these violations.

## I.    THE CLEAN WATER ACT AND ITS REQUIREMENTS

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251.  The CWA prohibits "the discharge of any pollutant by any person" from a point source into navigable waters unless allowed by permit. 33 U.S.C. § 1311(a). *See Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000) (holding discharge of pollutants without permit, or in violation of permit, is illegal).  The Act defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation … from which pollutants are conveyed." 33 U.S.C. § 1362(14).  "Pollutant" is defined to include any "industrial, municipal, and agricultural wastes" discharged into water. 33 U.S.C. § 1362(6).

publicjustice.net     National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax
West Coast Office
475 14th Street, Suite 610, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 2 of 16

CWA jurisdiction extends to "navigable waters," a phrase defined as "the waters of the United States," *id.* § 1362(7), which include tributaries to navigable waters. *Id.* § 328.2(a)(5).

The CWA is administered largely through its National Pollutant Discharge Elimination System (NPDES) permit program. 33 U.S.C. § 1342.  The Environmental Protection Agency (EPA) may delegate this permitting system to the states. *See id.* § 1342(b); 40 C.F.R. § 123.61. In 1975, EPA delegated the permitting program to Colorado. *See* 52 Fed. Reg. 27,578 (July 22, 1987) ("State NPDES Program Status … Approved State NPDES permit program … Colorado … 03/27/75[.]"); *see also* Colo. Rev. Stat. Ann. § 25-8-202(6)-(7).  The Colorado Department of Public Health & Environment (CDPHE), through its Water Quality Control Division, is the state agency authorized to issue and enforce the NPDES permitting program, known locally as the Colorado Discharge Permit System (CDPS).

Ongoing violations of the CWA and NPDES permits are enforceable through the Act's citizen suit provision. 33 U.S.C. § 1365(a); *id.* § 1365(f) (defining "effluent standard or limitation" to include permit terms and conditions).  This provision requires citizens to send a notice letter to the owners/operators of a violating facility, EPA and the Chief Administrative Office of the state water pollution control agency before bringing suit. *Id.* § 1365(b). *See* 40 C.F.R. § 135.2.  A citizen suit may proceed sixty days after the notice letter, unless either EPA or the relevant state has commenced and is diligently prosecuting a civil action in federal or state court. 33 U.S.C. § 1365(b)(1)(B).  As required by the CWA, this letter provides notice of the violations that have occurred and continue to occur at the Lone Tree Plant. *See* 40 C.F.R. § 135.3(a).

## II.    FACTUAL BACKGROUND

The South Platte River originates southwest of Denver in the Rocky Mountains and flows northeast through Denver and across the high plains of the northeastern Colorado.  The river basin extends 21,000 square miles before entering Nebraska and eventually joining the Missouri River.  Between the City of Greeley and the Nebraska border, CDPHE has designated agriculture, aquatic life, recreation and water supply as the beneficial uses of the South Platte River.  CDPHE designated these same uses along Lone Tree Creek, a tributary stream that flows south into the South Platte east of Greeley.  In general, use designations help ensure that Colorado's waterways remain healthy and do not endanger public health and safety.

Both the Swift Beef Company and JBS USA own and/or operate the Lone Tree Wastewater Treatment Plant, located on 24750 Weld County Road 62 1/2, Greeley, Colorado 80631.  JBS USA is headquartered in Greeley, Colorado and is a subsidiary of JBS S.A., a multi-national meat producer based in Brazil.  Swift Beef Company and JBS USA are "person[s]" responsible for the violations alleged in this Notice Letter. *See* 33 U.S.C. § 1362(5) (defining "person" to include corporations).  Swift Beef Company and JBS USA's ownership and operation of the Plant have resulted, and continue to result, in effluent discharges that exceed the Permit's limits and other requirements, in violation of the CWA.  Swift Beef Company and JBS

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 3 of 16

USA actively control and make all decisions regarding the treatment and release of wastewater into Lone Tree Creek from the Plant. The current and effective CDPS Permit CO0027707 was issued to "Swift Beef Company."

The Plant accepts and treats wastewater generated by two nearby slaughterhouses—JBS's beef slaughterhouse and Mountain States Rosen's lamb slaughterhouse. The wastewater from these two slaughterhouses is combined and pumped east six miles to the Plant through a force-main pipeline. The Plant accepts approximately 3-4 millions gallons of wastewater per day from the slaughterhouses. Upon arrival at Lone Tree Creek, the wastewater—which contains animal fat, meat, blood, *E. coli*, ammonia and excrement—is stored and treated in the Plant's four anaerobic lagoons, polishing ponds, chlorine contact chamber and aeration systems.

The treated wastewater is discharged through a single point source into Lone Tree Creek. Lone Tree Creek is a perennial stream that flows south into the South Platte River. The distance between the Plant's discharge point in Lone Tree Creek and its confluence with the South Platte is less than a mile; the confluence is immediately west of Scout Island and just downstream of where the Cache la Poudre River joins the South Platte River.

## III.    THE LONE TREE WASTEWATER DISCHARGE PERMIT AND VIOLATIONS

### A.    Permit Terms and Conditions

The Plant's discharges are regulated under CDPS Permit No. CO0027707. The Plant first obtained the Permit in 1978 and the state renewed the Permit several times. The most recent version was issued in 2012. Although the Permit expired on November 30, 2017, on December 1, 2017 the state administratively continued the 2012 Permit. Consequently, the 2012 Permit controls.

The Permit authorizes Swift Beef Company and JBS USA to discharge treated animal wastewater into Lone Tree Creek from one discharge point. The Permit's discharge limits at this discharge point vary, however, depending upon three production levels at the two slaughterhouses. CDPS Permit, Part I(A)(2).[1] When slaughterhouse production exceeds level one, the Plant must give notice to the state before increasing production to the second or third level.

---

[1]    Production level 1 (001A) applies when the average daily slaughter of beef (average weight 1,300 lbs.) ranges from 3,000 head/day to 4,699 head/day; level 2 (002A) applies when beef slaughter ranges from 4,700 head/day to 5,500 head/day; level 3 (003A) applies when beef slaughter ranges from 5,501 head/day to 6,000 head/day. *See* CDPS Permit, Part I(A)(1). For all three production levels, the average daily slaughter of lamb (average weight 160 lbs.) is set at 2,500 head/day. *Id*.

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 4 of 16

The Permit obligates Swift Beef Company and JBS USA to self-monitor by sampling its point source discharges in accordance with specified instructions that address timing (daily maximums, seven- and 30-day averages), frequency (daily, monthly and quarterly) and sample type (calculated, composite (4) and grab (1)). Sampling must occur after Swift Beef Company and JBS USA disinfects the animal wastewater and before the effluent mixes with the receiving waters in Lone Tree Creek. CDPS Permit, Part I(A)(1). Swift Beef Company and JBS USA must provide the state and EPA with monthly compilations of its effluent concentrations and Whole Effluent Testing (WET) results in discharge monitoring reports (DMRs). CDPS Permit, Part I(A)(2); CDPS Permit, Part I(D)(1). Violations occur when Swift Beef Company and JBS USA "fail to comply with any terms and/or conditions of this permit" or when there is a "discharge of any pollutant identified in this permit more frequently than or at a level in excess of that authorized." CDPS Permit, Part II(B)(8).

B.       Effluent Discharge Limits and Requirements

Based on a review of publicly available documents, the Center for Biological Diversity and Food & Water Watch are informed and believe that the Lone Tree Plant is in ongoing violation of the Permit and the CWA. This information is derived from the Plant's physical DMR forms (EPA Form 3320) submitted to the state and the Plant's filings through EPA's NetDMR system, both submitted under penalty of perjury. These data provided to EPA are available on EPA's Enforcement and Compliance History Online (ECHO) website.

1)       Numerical Violations for Specific Pollutants

Part I(A)(2) of the Permit sets limits for Swift Beef Company and JBS USA's discharges into Lone Tree Creek for effluent flow, pH, fecal coliform, chlorine, nitrogen (total and ammonia), oil and grease, BOD and total suspended solids. For each of these parameters, the Permit establishes both a monthly limit and a daily maximum limit for each month. Discharges exceeding these limits are described below in Table 1.[2] These are violations of the CWA and the Permit and are enforceable through the CWA's citizen suit provision.

| TABLE 1: VIOLATIONS OF EFFLUENT LIMITATIONS FOR DISCHARGES TO SURFACE WATER | | | | | |
|---|---|---|---|---|---|
| Date (Monthly Monitoring Period; specific date if available) | Parameter | Units | Limit (maximum) | Sample Measurement | Statistical Basis |

---

[2]       Unless a parameter's limit is based on a daily maximum value, the number of days in the monitoring period equals the number of days of violation for that parameter.

National Headquarters
1620 L Street NW, Suite 630, Washington DC 20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA 94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 5 of 16

| 09/01/2018 – 09/30/2018 | Nitrogen, ammonia total (as N) | mg/L | 2.1 | 2.91 | 30-day Average (composite) |
|---|---|---|---|---|---|
| 09/01/2018 – 09/30/2018 | Nitrogen, ammonia total (as N) | mg/L | 8 | 14.6 | Daily Maximum (composite) |
| 09/01/2018 – 09/30/2018 | Solids, total suspended | lb/day | 3,515 | 6,150 | Daily Maximum (composite) |
| 07/01/2018 – 07/31/2018 (July 1) | Nitrogen, ammonia total (as N) | mg/L | 8 | 13.6 | Daily Maximum (composite) |
| 07/01/2018 – 07/31/2018 | Solids, total suspended | lb/day | 1,368 | 2,561 | 30-day Average (composite) |
| 07/01/2018 – 07/31/2018 (July 26, 27) | Solids, total suspended | lb/day | 2,735 | 16,494 | Daily Maximum (composite) |
| 06/01/2018 – 06/30/2018 | Nitrogen, ammonia total (as N) | mg/L | 2.5 | 6.41 | 30-day Average (composite) |
| 06/01/2018 – 06/30/2018 | Nitrogen, ammonia total (as N) | mg/L | 8 | 16.5 | Daily Maximum (composite) |
| 06/01/2018 – 06/30/2018 | Solids, total suspended | lb/day | 1,758 | 3,650 | 30-day Average (composite) |
| 06/01/2018 – 06/30/2018 | Solids, total suspended | lb/day | 3,515 | 11,675 | Daily Maximum (composite) |
| 04/01/2018 – 04/30/2018 | Nitrogen, ammonia total (as N) | mg/L | 8 | 8.22 | Daily Maximum (composite) |
| 01/01/2016 – 01/31/2016 | Solids, total suspended | lb/day | 3,515 | 7,470 | Daily Maximum (composite) |
| 05/01/2015 – 05/31/2015 | Nitrogen, ammonia total (as N) | mg/L | 8 | 9.28 | Daily Maximum (composite) |

2)    <u>Violation of Notification Requirements</u>

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 6 of 16

Upon violating a Permit limit, Swift Beef Company and JBS USA must provide: a description of the cause of noncompliance, the period of noncompliance, including the exact days and time, anticipated time the discharge will return to compliance and steps being taken to reduce, eliminate and prevent the recurrence of the noncomplying discharge. CDPS Permit, Part II(A)(4)(a) & (b).

Despite the aforementioned effluent-limit violations, Swift Beef Company and JBS USA have not submitted the required reports and necessary information to the state or EPA.  The Swift Beef Company and JBS USA are in violation of the Permit's notification and reporting requirements, *see* CDPS Permit, Part II(A)(4)(a) & (b), and these violations are enforceable through the CWA's citizen suit provision. *See* 33 U.S.C. § 1365(a)(1), § 1365(f)(6).  Each day that Swift Beef Company and JBS USA do not provide the required information about each violation to the state is a separate and distinct violation of the CWA and the Permit.

C.    WET Testing Limits and Requirements

The Plant is subject to Colorado's narrative toxicity standard.  That standard is set out in Regulation 31.11(1)(a)(iv) of the Basic Standards and Methodologies for Surface Water and provides: "state water shall be free from substances attributable to human-caused point source and nonpoint source discharge in amounts, concentrations or combinations which are harmful to the beneficial uses or toxic to humans, animals, plants or aquatic life."

To implement this toxicity standard, the Permit requires Swift Beef Company and JBS USA to conduct Whole Effluent Toxicity tests of discharges from its discharge point (or Outfall) and meet applicable standards that ensure the water is not unacceptably toxic.  WET testing assesses the aggregate toxic effect of a wastewater sample measured by a test organism's response: lethal, impaired growth or reproduction or no observed effect.  The tests required by the Permit measure the effect of the Plant's effluent at varying concentrations on two aquatic organisms (*ceriodaphnia dubia* and *pimephales promelas*).  Swift Beef Company and JBS USA must perform WET testing quarterly, using three separate composite (four) samples.

The Permit mandates the application of two specific WET tests to evaluate chronic toxicity.  The first is the 25-percent seven-day inhibition concentration (IC25) standard, which identifies the effluent concentration at which no more than 25 percent of the test organisms experience reproduction or growth inhibition after seven days of exposure.  For example, if a test yields an IC25 value of 70 percent, that means a sample containing 70 percent effluent—diluted with 30 percent fresh water—caused inhibited reproduction or growth in 25 percent of the test organisms.  Here, the Permit's standard is that 100 percent effluent (*i.e.* pure effluent without any dilution) causes no more than 25 percent of the test organisms exhibit reproductive or growth inhibition at the end of a seven-day period.

The second test is NOEC ("no observed effects concentration"), which evaluates the point at which there is an effluent concentration that results in "no observed effects."  NOEC

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 7 of 16

determines the highest concentration of wastewater effluent that shows no statistically detectable effect on the aquatic organism.  Here, too, the Permit's concentration standard is 100%, such that there must be no observed effects when the organisms are placed in pure effluent.

The Permit's WET testing requirements also require that Swift Beef Company and JBS USA:

1) submit, along with the DMRs containing the WET testing results, all laboratory statistical summary sheets, summaries of the determination of a valid, invalid or inconclusive test and copies of any chain of custody forms, and

2) when the WET testing results show a violation of the Permit limit—both NOEC and IC25 are below 100%, or either the NOEC or the IC25 are below 100% for two consecutive monitoring periods—conduct accelerated testing using the single species found to be more sensitive, or conduct a Toxicity Identification Evaluation or a Toxicity Reduction Evaluation.

1)      Violations of the WET Testing Limits

Swift Beef Company and JBS USA's violations of the WET testing requirements are detailed below.  Table 2 contains the reported quarterly toxicity test results and reveals multiple and continuous violations of the Permit's limits.

| TABLE 2: VIOLATIONS OF CHRONIC WHOLE EFFLUENT TOXICITY LIMIT | | | | | | |
|---|---|---|---|---|---|---|
| Date: (Quarterly Monitoring Period) | Outfall | Parameter | Units | Limit (min) | Instream Waste Concentration | Limit Type |
| 07/01/2018 – 09/30/2018 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 27.55 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 80 | |
| 03/01/2018 – 06/30/2018 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 75.37 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 60 | |
| 03/01/2018 | 002A | Chronic WET 7- | percent | 100 | 96.11 | Minimum |

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 8 of 16

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| –<br>06/30/2018 | | day IC25<br>(*Pimephales promelas*) | | | | | |
| | | Chronic WET 7-day NOEC<br>(*Pimephales promelas*) | | | | 60 | |
| 01/01/2018<br>–<br>03/31/2018 | 002A | Chronic WET 7-day IC25<br>(*Ceriodaphnia dubia*) | percent | 100 | | 84.26 | Minimum |
| | | Chronic WET 7-day NOEC<br>(*Ceriodaphnia dubia*) | | | | 80 | |
| 10/01/2017<br>–<br>12/31/2017 | 002A | Chronic WET 7-day IC25<br>(*Ceriodaphnia dubia*) | percent | 100 | | 84.75 | Minimum |
| | | Chronic WET 7-day NOEC<br>(*Ceriodaphnia dubia*) | | | | 80 | |
| 07/01/2017<br>–<br>09/30/2017 | 001A | Chronic WET 7-day IC25<br>(*Ceriodaphnia dubia*) | percent | 100 | | 64.92 | Minimum |
| | | Chronic WET 7-day NOEC<br>(*Ceriodaphnia dubia*) | | | | 60 | |
| 04/01/2017<br>–<br>06/30/2017 | 002A | Chronic WET 7-day IC25<br>(*Ceriodaphnia dubia*) | percent | 100 | | 69.40 | Minimum |
| | | Chronic WET 7-day NOEC<br>(*Ceriodaphnia dubia*) | | | | 60 | |
| 01/01/2017<br>–<br>03/31/2017 | 002A | Chronic WET 7-day IC25<br>(*Ceriodaphnia dubia*) | percent | 100 | | 79.38 | Minimum |
| | | Chronic WET 7-day NOEC<br>(*Ceriodaphnia dubia*) | | | | 80 | |
| 10/01/2016<br>–<br>12/31/2016 | 002A | Chronic WET 7-day IC25<br>(*Ceriodaphnia dubia*) | percent | 100 | | 67.43 | Minimum |
| | | Chronic WET 7-day NOEC | | | | 60 | |

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 9 of 16

| | | (*Ceriodaphnia dubia*) | | | | |
|---|---|---|---|---|---|---|
| 07/01/2016 – 09/30/2016 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 86.46 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 80 | |
| 04/01/2016 – 06/30/2016 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 86 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 80 | |
| 01/01/2016 – 03/31/2016 | 001A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 75.45 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 80 | |
| 10/01/2015 – 12/31/2015 | 001A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 94.02 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 80 | |
| 07/01/2015 – 09/30/2015 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 90.74 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 80 | |
| 04/01/2015 – 06/30/2015 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 95.97 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 80 | |
| 01/01/2015 – 03/31/2015 | 001A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 65.75 | Minimum |
| | | Chronic WET 7-day NOEC | | | 60 | |

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 10 of 16

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (*Ceriodaphnia dubia*) | | | | |
| 10/01/2014 – 12/31/2014 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 72.09 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 60 | |
| 07/01/2014 – 09/30/2014 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 80.67 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 60 | |
| 04/01/2014 – 06/30/2014 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 65.28 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 60 | |
| 04/01/2014 – 06/30/2014 | 003A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 65.28 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 60 | |
| 01/01/2014 – 03/31/2014 | 002A | Chronic WET 7-day IC25 (*Ceriodaphnia dubia*) | percent | 100 | 55.08 | Minimum |
| | | Chronic WET 7-day NOEC (*Ceriodaphnia dubia*) | | | 40 | |

As detailed in Table 2, every chronic WET testing result since January 1, 2014 has violated limits in the Plant's CDPS Permit, Part 1(B)(3)(b).  Accordingly, the Swift Beef Company and JBS USA are violating the CWA and these violations are enforceable through the CWA's citizen suit provision. *See* 33 U.S.C. § 1365(a)(1), § 1365(f)(6).

2)    <u>Violations of Notification Requirements</u>

The Permit requires that Swift Beef Company and JBS USA, when there is a WET testing limit, disclose to the state and EPA information about the violation and how Swift Beef

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 11 of 16

Company and JBS USA will correct the problem. CDPS Permit, Part 1(B)(3)(b) (notification required within 14 days of WET testing violation); CDPS Permit, Part II(A)(4)(a) & (b). For each violation of the WET testing limits identified in Table 2, Swift Beef Company and JBS USA failed to provide notification and report information to CDPHE or EPA. The Swift Beef Company and JBS USA are therefore in violation of the Permit's notification and reporting requirements and the CWA. *See* CDPS Permit, Part II(A)(4)(a) & (b). These violations are enforceable through the CWA's citizen suit provision. *See* 33 U.S.C. § 1365(a)(1), § 1365(f)(6). Each day that Swift Beef Company and JBS USA do not provide the required information about each violation to the state is a separate and distinct violation of the CWA and the Permit.

3)      Violations of Requirement to Submit Information about WET Testing

The Permit requires Swift Beef Company and JBS USA to provide CDPHE with laboratory statistical summary sheets, summaries of the determination of a valid, invalid or inconclusive test and copies of any chain of custody forms. For each violation of the WET testing limits identified in Table 2, Swift Beef Company and JBS USA have not submitted the required information about the WET tests performed. Here, too, the Swift Beef Company and JBS USA are violating the Permit's requirements and the CWA. *See* CDPS Permit, Part I(B)(3)(a). These violations are enforceable through the CWA's citizen suit provision. *See* 33 U.S.C. § 1365(a)(1), § 1365(f)(6). Each day that Swift Beef Company and JBS USA do not provide the WET testing information to the state is a separate and distinct violation of the CWA and the Permit.

4)      Violations of Requirement to Perform Accelerated Testing

For each violation of the WET testing limits and standards identified in Table 2, the Permit requires Swift Beef Company and JBS USA to conduct accelerated testing using the more sensitive species, or, alternatively, a Toxicity Identification Evaluation or a Toxicity Reduction Evaluation. One of these Automatic Compliance Responses is mandated by the CDPS Permit, Part I(B)(3)(C) due to violations of the WET testing limits. Swift Beef Company and JBS USA have not performed any of the accelerated testing requirements after violating the WET testing standards in each quarter since January 2014. By failing to perform these additional tests, the Swift Beef Company and JBS USA are violating the Permit's limits and standards and the CWA. These violations are enforceable through the CWA's citizen suit provision. *See* 33 U.S.C. § 1365(a)(1), § 1365(f)(6). Each day that Swift Beef Company and JBS USA do not perform the additional testing is a separate and distinct violation of the CWA and the Permit.

D.      Compliance Schedule for Completing Ammonia Reduction Project

The Permit includes a compliance schedule for tasks associated with an ammonia reduction project, which has been deemed essential to comply with ammonia limits and WET testing standards. *See* CDPS Permit, Part I(B)(2)(a). The schedule obligates Swift Beef

National Headquarters
1620 L Street NW, Suite 630, Washington DC 20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA 94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 12 of 16

Company and JBS USA to take specific steps over a five-year period and submit annual reports to CDPHE detailing the steps being taken:

-       by September 30, 2013, develop and submit engineering/activity plans for an ammonia reduction project;
-       by September 30, 2014, submit progress report for completing an ammonia reduction project;
-       by September 30, 2015, submit progress report for completing an ammonia reduction project;
-       by September 30, 2016, submit progress report for completing an ammonia reduction project;
-       by September 30, 2017, complete the ammonia reduction project that will allow Swift Beef Company and JBS USA to satisfy ammonia limits at the Plant.

*Id*. Each deadline contains a 14-day grace period. *Id*.

Swift Beef Company and JBS USA have violated the compliance schedule by not: submitting the engineering/activity plans to CDPHE by September 30, 2013 and the annual status reports by September 30, 2014, 2015, 2016; or completing construction and/or changing processes by September 30, 2017 that ensure compliance with the Permit's ammonia limits. By failing to comply with this schedule, the Swift Beef Company and JBS USA are violating the Permit's limits and standards and the CWA. These violations are enforceable through the CWA's citizen suit provision. *See* 33 U.S.C. § 1365(a)(1), § 1365(f)(6). Each day that Swift Beef Company and JBS USA do not comply with this schedule is a separate and distinct violation of the CWA and the Permit.

## IV.    RELIEF TO BE REQUESTED

To remedy these violations, we intend to ask that the court order the Swift Beef Company and JBS USA to pay civil penalties, as authorized by 33 U.S.C. § 1365, based on the factors set forth in 33 U.S.C. § 1319(d) and calculated in accordance with 40 C.F.R. § 19.4. Swift Beef Company and JBS USA are liable for violations occurring each day before the date of this letter and for every day these violations continue. Penalties are calculated based on the following: up to $37,500 per day for each violation from January 12, 2009 through November 2, 2015; and $53,484 per day for each violation occurring after November 2, 2015. *See* 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

We will also seek declaratory relief, confirming that the Swift Beef Company and JBS USA have violated and continue to violate the CWA. We will seek injunctive relief, 33 U.S.C. § 1365, that requires the Swift Beef Company and JBS USA to take all actions necessary to comply with the Permit and all other applicable CWA and Colorado Water Quality Control Act requirements, prevent further water pollution at the Lone Tree Plant and remediate any ongoing pollution and environmental harm caused by the Plant's illegal discharges.

publicjustice.net      National Headquarters      West Coast Office
1620 L Street NW, Suite 630, Washington DC  20036      475 14th Street, Suite 610 Oakland CA  94612
(202) 797-8600 phone      (510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 13 of 16

Lastly, we intend to seek the recovery of costs, including attorney fees, as authorized by the CWA, 33 U.S.C. § 1365(d).

## V.    PARTIES GIVING NOTICE

The parties giving notice, including their full names, addresses and telephone numbers, are as follows:

Center for Biological Diversity
Attn: Michael Saul
1536 Wynkoop St., Ste. 421
Denver, Colorado 80202
(303) 915-8308

Food & Water Watch
Attn: Jason Harrison
1801 N. Williams St., Ste. 400
Denver, Colorado 80218
(720) 372-1389

Center for Biological Diversity is a national non-profit, 501(c)(3) organization with multiple offices and thousands of members in Colorado.   The Center has programs and campaigns that address the plight of imperiled species in this country, including the extensive harms caused by animal agriculture on biodiversity, public health, and sustainable food systems. Through its efforts, the Center has developed outreach, education, and policy materials on the negative effects of industrial agricultural systems on our environment, including as a result of pesticide use, greenhouse gas emissions, pollution from animal waste, and overuse of water resources.

Food & Water Watch is a national nonprofit organization that champions healthy food and clean water for all by standing up to corporations that put profits before people and by advocating for a democracy that improves people's lives and protects the environment.  FWW maintains an office in Denver and has more than 12,000 members in Colorado.  Factory farming is one of FWW's priority issues, and FWW is engaged in numerous campaigns to hold the factory farm industry—including corporate slaughter facilities—accountable for its adverse impacts on rural communities and the environment.  Through grassroots organizing, policy advocacy, research, communications and litigation, FWW works to increase transparency about the factory farm industry's harmful impacts, reduce meat companies' pollution of our waterways and strengthen public and government oversight of livestock production.

Members of both organizations enjoy the waters of Lone Tree Creek and the South Platter River and the surrounding aquatic environment for recreational activities, including

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 14 of 16

fishing, swimming, boating, bird and wildlife viewing, hiking and walking and aesthetic enjoyment.  Unauthorized and illegal discharges from the Plant injure members engaged in each of these uses.

Counsel for Center for Biological Diversity and Food and Water Watch has been retained and their contact information is:

Neil Levine
Justin Connor
Public Justice
4404 Alcott Street
Denver, Colorado 80211
(303) 455-0604
nlevine@publicjustice.org

Hannah Connor
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
(202) 681-1676
hconnor@biologicaldiversity.org

Tarah Heinzen
Food & Water Watch
2009 NE Alberta St. Ste. 207
Portland, OR 97211
(202) 683-2457
theinzen@fwwatch.org

Please contact Neil Levine at Public Justice if you would like to discuss the content of this letter.

***

Center for Biological Diversity and Food & Water Watch believe that the data and information contained in this letter provide Swift Beef Company and JBS USA with sufficient information about the alleged violations and the ability to come into compliance with the CWA and the Permit.  They intend to file a citizen suit under the CWA, 33 U.S.C. § 1365(a), against Swift Beef Company and JBS USA and their agents for the above-referenced violations upon the

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 15 of 16

expiration of the 60-day notice period. Additional information, including information not yet available to the Center for Biological Diversity and Food & Water Watch, may reveal additional violations, which this letter intends to cover.

These organizations would welcome the opportunity to discuss this matter with you and potentially resolve any disputes so as to avoid time-intensive and resource-consuming litigation. Please contact us promptly if you believe we do not understand facts about the Plant and the alleged violations correctly or wish to discuss effective remedies for the violations noted in this letter. We do not intend to delay the filing of a complaint in federal court if discussions are continuing at the conclusion of the 60-day period. Thank you.

Sincerely,

*/s/ Neil Levine*

Neil Levine
Jason Connor
Public Justice

Hannah Connor
Center for Biological Diversity

Tarah Heinzen
Food & Water Watch

cc:

Acting Administrator Andrew Wheeler
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Ave., NW
Mail Code 1101A
Washington, D.C. 20460

Regional Administrator Douglas Benevento
Environmental Protection Agency Region 8
1595 Wynkoop Street
Mail Code 8RA
Denver, CO 80202-1129

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

Sixty-Day Notice Letter: Swift Beef Company-JBS USA
January 31, 2019
Page 16 of 16


U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001


Karin McGowan
Interim Director
Colorado Department of Public Health and Environment
4300 Cherry Creek Drive South
Denver, CO 80246


Corporation Services Co.
Registered Agent for Swift Beef Company
1900 W. Littleton Blvd.
Littleton, CO 80120


Corporation Services Co.
Registered Agent for JBS USA
1560 Broadway, Ste. 2090
Denver, CO 80202

publicjustice.net

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA  94612
(510) 622-8150 phone

# EXHIBIT B



PUBLIC JUSTICE
IMPACT. CHANGE

July 24, 2020

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Swift Beef Company
Lone Tree Wastewater Treatment Plant
1770 Promontory Circle
Greeley, CO 80634

Andre Nogueira
President and Chief Executive Office
JBS USA
1770 Promontory Circle
Greeley, CO 80634

Re:     Supplemental Notice of Violations and Intent to Sue under the Clean Water Act,
        33 U.S.C. § 1251 *et seq.*

Through undersigned counsel, the Noticing Parties—Center for Biological Diversity and
Food & Water Watch—provide Swift Beef Company and JBS USA (collectively, Swift Beef)
with this supplemental notice of intent to sue concerning Clean Water Act (CWA) violations at
your Lone Tree Wastewater Treatment Plant.

On January 31, 2019, these same Noticing Parties sent their 60-day notice letter to Swift
Beef identifying multiple violations of the CWA permit (Permit No. CO0027707) applicable to
the Lone Tree Wastewater Treatment Plant and your effluent discharges. That notice letter is
attached and fully incorporated into this supplemental notice.

Recently obtained information reveals new and additional CWA violations as a result of
effluent discharged from your Lone Tree Wastewater Treatment Plant. This supplemental notice
informs Swift Beef that—sixty days from the date of this letter—the Center for Biological
Diversity and Food & Water Watch intend to amend their existing district court lawsuit against
Swift Beef to include violations of Whole Effluent Toxicity (WET) and ammonia limits in your
CWA permit.

## VIOLATIONS OF THE CLEAN WATER ACT

A. WET Limit Violations

The Permit requires Swift Beef to conduct two types of WET testing. One test is known
as the 25-percent seven-day inhibition concentration (IC25) standard. IC25 identifies the
effluent concentration at which no more than 25 percent of the test organisms experience

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
475 14th Street, Suite 610, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax

reproduction or growth inhibition after seven days of exposure.   The second test is known as NOEC, or "no observed effects concentration," and determines the highest concentration of discharged effluent that shows no statistically detectable effect on the aquatic organism.  For both tests, the Permit requires the use of 100 percent pure effluent—meaning the effluent is not diluted—to account Lone Tree Creek's low or intermittent flows.  WET testing measures the response of a water flea (*ceriodaphnia dubia*) and a fathead minnow (*pimephales promelas*) when exposed to effluent discharged from the Lone Tree Wastewater Treatment Plant.

In the first quarter of 2020, Swift Beef discharged effluent from the Lone Tree Wastewater Treatment Plant (Outfall 001x) that required dilution to a 20-percent concentration to satisfy the NOEC test endpoint (for *ceriodaphnia dubia*) and 17.33-percent concentration to satisfy the IC25 test endpoint (for *ceriodaphnia dubia*).  These concentrations were below the 100 percent instream-waste-concentration requirement in the CWA Permit.  Violating these WET limits is a violation of your CWA Permit and the CWA.

In the second quarter of 2020, Swift Beef discharged effluent from the Lone Tree Wastewater Treatment Plant (Outfall 001x) that required a 60-percent concentration to satisfy the NOEC test endpoint (for *ceriodaphnia dubia*) and 73.05-percent concentration to satisfy the IC25 test endpoint (for *ceriodaphnia dubia*).  These concentrations were below the 100 percent instream-waste-concentration requirement in the CWA Permit.  Violating these WET limits is a violation of your CWA Permit and the CWA.

Further, Swift Beef discharged effluent from the Lone Tree Wastewater Treatment Plant (Outfall 001x) in a manner that violated the WET limit for the fathead minnow (*pimephales promelas*): Swift Beef discharged effluent that required a 80-percent concentration in order to satisfy the NOEC test endpoint in the first quarter of 2020 and a 20-percent concentration in the second quarter of 2020.  These concentrations were below the 100 percent instream-waste-concentration requirement in the CWA Permit.  Violating these WET limits is a violation of your CWA Permit and the CWA.

B.   Ammonia, Daily and 30-day Average

Swift Beef's effluent discharges from the Outfall at the Lone Tree Wastewater Treatment Plant violated the daily limit for total ammonia (8 mg/l) as follows:

- Swift Beef exceeded the daily maximum concentration of total ammonia on January 12, 2020 (14.9 mg/l) and on January 12, 2020 (15.3 mg/l).

- Swift Beef exceeded the daily maximum concentration of total ammonia on February 9 and 10, 2020 (24.9 mg/l on one day in February).

- Swift Beef exceeded the daily maximum concentration of total ammonia on April 23, 2020 (9.8 mg/l), April 24, 2020 (9.85 mg/l), April 25, 2020 (8.91 mg/l), April 26, 2020 (9.52 mg/l), April 27, 2020 (10.2 mg/l), April 28, 2020 (102 mg/l), April 29,

publicjustice.net         National Headquarters                          West Coast Office
                          1620 L Street NW, Suite 630, Washington DC  20036      475 14th Street, Suite 1230, Oakland CA  94612
                          (202) 797-8600 phone • (202) 232-7203 fax        (510) 622-8150 phone • (510) 622-8155 fax

Supplemental Sixty-Day Notice Letter
July 24, 2020
Page 3 of 5

2020 (9.58 mg/l), and April 30, 2020 (11.8 mg/l).

- Swift Beef exceeded the daily maximum concentration of total ammonia on May 1, 2020 (14.9 mg/l) and May 2, 2020 (12.4 mg/l).

Swift Beef's effluent discharges from the Outfall at the Lone Tree Wastewater Treatment Plant violated the monthly average for total ammonia as follows:

- The Permit limits the 30-day average of total ammonia concentration in the month of February to 3.4 mg/l. The 30-day average of total ammonia concentration in February 2020 was 4.9 mg/l.

- The Permit limits the 30-day average of total ammonia concentration in the month of April to 3.1 mg/l. The 30-day average of total ammonia concentration in April 2020 was 5.31 mg/l.

### PARTIES GIVING NOTICE

The Noticing Parties' contact information is as follows:

Center for Biological Diversity
Attn: Michael Saul
1536 Wynkoop St., Ste. 421
Denver, Colorado 80202
(303) 915-8308

Food & Water Watch
Attn: Tyler Van Kirk
1801 N. Williams St., Ste. 400
Denver, Colorado 80218
(720) 372-1389

Counsel for Center for Biological Diversity and Food and Water Watch has been retained and their contact information is:

Neil Levine
Public Justice
4404 Alcott Street
Denver, Colorado 80211
(303) 455-0604
nlevine@publicjustice.net

Hannah Connor
Center for Biological Diversity

National Headquarters
1620 L Street NW, Suite 630, Washington DC  20036
(202) 797-8600 phone • (202) 232-7203 fax

West Coast Office
475 14th Street, Suite 1230, Oakland CA  94612
(510) 622-8150 phone • (510) 622-8155 fax

Supplemental Sixty-Day Notice Letter
July 24, 2020
Page 4 of 5


P.O. Box 2155
St. Petersburg, Florida 33731
(202) 681-1676
hconnor@biologicaldiversity.org

Tarah Heinzen
Food & Water Watch
36 N Buffalo Street
Portland, Oregon 97217
(202) 683-2457
theinzen@fwwatch.org

### RELIEF REQUESTED

The Noticing Parties will seek declaratory and injunctive relief, civil penalties, and all other relief authorized by law for these violations.

\*\*\*

Center for Biological Diversity and Food & Water Watch believe that the data and information contained in this letter provide Swift Beef with sufficient information about the alleged violations and the ability to come into compliance with the CWA and CWA permit. They intend to file a new or amended citizen suit under the CWA, 33 U.S.C. § 1365(a), against Swift Beef and their agents for the above-referenced violations upon the expiration of the 60-day notice period. Additional information, including information not yet available to the Center for Biological Diversity and Food & Water Watch, may reveal additional violations, which this letter intends to cover.

These organizations would welcome the opportunity to discuss this matter with you and potentially resolve any disputes so as to avoid time-intensive and resource-consuming litigation. Please contact us promptly if you believe we do not understand facts about the Lone Tree Wastewater Treatment Plant and the alleged violations correctly or wish to discuss effective remedies for the violations noted in this letter.

Thank you.

publicjustice.net          National Headquarters                                    West Coast Office
                           1620 L Street NW, Suite 630, Washington DC  20036        475 14th Street, Suite 1230, Oakland CA  94612
                           (202) 797-8600 phone • (202) 232-7203 fax                (510) 622-8150 phone • (510) 622-8155 fax

Supplemental Sixty-Day Notice Letter
July 24, 2020
Page 5 of 5

Sincerely,

*/s/ Neil Levine*

Neil Levine
Public Justice

Hannah Connor
Center for Biological Diversity

Tarah Heinzen
Food & Water Watch

cc:

Administrator Andrew Wheeler
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Ave., NW
Mail Code 1101A
Washington, D.C. 20460

Regional Administrator Gregory Sopkin
Environmental Protection Agency Region 8
1595 Wynkoop Street
Mail Code 8RA
Denver, CO 80202-1129

U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Jill Hunsacker Ryan
Executive Director
Colorado Department of Public Health and Environment
4300 Cherry Creek Drive South
Denver, CO 80246

Corporation Service Co.
Registered Agent
1900 West Littleton Blvd.
Littleton, Colorado 80120

publicjustice.net    National Headquarters    West Coast Office
1620 L Street NW, Suite 630, Washington DC  20036    475 14th Street, Suite 1230, Oakland CA  94612
(202) 797-8600 phone • (202) 232-7203 fax    (510) 622-8150 phone • (510) 622-8155 fax

# EXHIBIT C



**COLORADO**
Department of Public
Health & Environment

August 6, 2020

Corporation Service Company
1770 Promontory Circle
Greeley, CO 80634

_Certified Mail Number: 7018 0360 0000 1227 5851_

RE:    Service of Notice of Violation / Cease and Desist Order, Number: IO-200806-1

Dear Sir or Madam:

Swift Beef Company is hereby served with the enclosed Notice of Violation / Cease and Desist Order ("NOV/CDO"). The NOV/CDO is issued by the Colorado Department of Public Health and Environment's Water Quality Control Division ("Division") pursuant to authority given to the Division by §§ 25-8-602 and 25-8-605, C.R.S., of the _Colorado Water Quality Control Act_ ("Act"). The Division bases the NOV/CDO upon findings that Swift Beef Company violated the Act and/or a discharge permit, as described in the enclosed NOV/CDO.

Pursuant to § 25-8-603, C.R.S., Swift Beef Company is required, within 30 calendar days of receipt of this NOV/CDO, to submit to the Division an answer admitting or denying each paragraph of the Findings of Fact and responding to the Notice of Violation.

This action could result in the imposition of civil penalties. The Division is authorized pursuant to § 25-8-608, C.R.S., to impose a penalty of up to $10,000 per day for each day during which such violation occurs.

Please be advised that the Division is continuing its investigation into this matter and the Division may identify supplementary violations that warrant amendments to this NOV/CDO or the issuance of additional enforcement actions.

Should you or representatives of Swift Beef Company desire to discuss this matter informally with the Division, or if you have questions regarding the NOV/CDO, please do not hesitate to contact me at (303) 692-3290 or jacob.dyste@state.co.us.

Sincerely,

Jacob Dyste, Enforcement Specialist
Clean Water Enforcement Unit
WATER QUALITY CONTROL DIVISION

_Enclosure(s)_

cc:    Enforcement File

ec:    Fernando Meza, Swift Beef Company, _fernando.meza@jbssa.com_
       Michael Boeglin, EPA Region 8
       Ben Frissell, Weld County Department of Public Health and Environment, _bfrissell@co.weld.co.us_
       Aimee Konowal, Watershed Section, CDPHE
       Nathan Moore, Compliance & Enforcement Section, CDPHE
       Mark Henderson, Grants and Loans Unit, CDPHE
       Doug Camrud, Engineering Section, CDPHE
       Clayton Moores, Field Services Section, CDPHE
       Michelle DeLaria, Permits Section, CDPHE



Kelly Morgan, Clean Water Enforcement Unit, CDPHE
Tania Watson, Data Management Workgroup, CDPHE



# COLORADO
## Department of Public Health & Environment

**WATER QUALITY CONTROL DIVISION**

---

**NOTICE OF VIOLATION / CEASE AND DESIST ORDER**          **NUMBER: IO-200806-1**

---

IN THE MATTER OF:          **SWIFT BEEF COMPANY**
                           **CDPS PERMIT NO. CO0027707**
                           **WELD COUNTY, COLORADO**

---

Pursuant to the authority vested in the Colorado Department of Public Health and Environment's ("Department") Division of Administration by §§25-1-109 and 25-8-302, C.R.S., which authority is implemented through the Department's Water Quality Control Division ("Division"), and pursuant to §§25-8-602 and 25-8-605 C.R.S., the Division hereby makes the following Findings of Fact and issues the following Notice of Violation / Cease and Desist Order ("Order"):

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. At all times relevant to the alleged violations identified herein, Swift Beef Company ("Swift Beef") was a Delaware foreign corporation in good standing and registered to conduct business in the State of Colorado.

2. Swift Beef is a "person" as defined under the Water Quality Control Act, §25-8-103(13), C.R.S. and its implementing permit regulation, 5 CCR 1002-61, §61.2(73).

3. Swift Beef owns and/or operates the Swift Beef - Lone Tree wastewater treatment facility, located at 40.438295°, -104.584381°, in the City of Greeley, Weld County, Colorado ("Facility").

4. The Facility receives wastewater from the Swift Beef Processing facility, which consists of a cattle and lamb slaughterhouse and packaging plant. Wastewater sources include washdown water from the kill floor, fabrication floor, rendering areas, blood processing areas, and carcasses including hides. The Facility uses four anaerobic lagoons in a paired series. Wastewater from the lagoons flows into a secondary biological nutrient activated sludge system consisting of anoxic and aerobic basins. This treatment is then directed to clarifiers followed by chlorination and dechlorination or polishing ponds, which is the final effluent treatment prior to aeration and discharge.

5. The Facility is the subject of the Colorado Discharge Permit System, Permit No. CO0027707 ("Permit"). The current version of the Permit became effective on December 1, 2012 and was set to expire November 30, 2017, but has been administratively continued pending Permit reissuance.

---



6. The Permit authorizes Swift Beef to discharge treated wastewater from the Facility through the outfall located at 40.440801°, -104.591681, into Lone Tree Creek. Three separate Outfalls are defined in the Permit (001A, 002A, and 003A) but all three are at the same location. Each outfall represents a different production level and includes different effluent limitations corresponding to the different production levels. These are the only outfalls permitted to Swift Beef.

7. Pursuant to 5 CCR 1002-61, §61.8, Swift Beef must comply with all the terms and conditions of the Permit, and violations of such terms and conditions as specified in the Permit may make Swift Beef subject to civil and criminal liability pursuant to §§25-8-601 through 25-8-612, C.R.S.

### Failure to Comply with Permit Effluent Limitations

8. Pursuant to Part I.A.1. and I.A.2. of the Permit, Swift Beef's effluent at Outfall 001A and 002A shall not exceed, among others not subject to this action, the effluent discharge limitations specified in the table below:

| SWIFT BEEF - LONE TREE EFFLUENT DISCHARGE LIMITATIONS | | | | | |
|---|---|---|---|---|---|
| Outfall | Parameter | | Limitation | | Sampling |
| | | | 30-day Avg. | Daily Max | Frequency | Type |
| 001A | pH | | -- | 6.5 - 9 | 5 Days/ Week | Grab |
| 002A | Total Ammonia as N (mg/L), January | | 3.7 | 8 | 5 Days/ Week | Composite |
| 002A | Total Ammonia as N (mg/L), February | | 3.4 | 8 | 5 Days/ Week | Composite |
| 001A | Total Ammonia as N (mg/L), April | | 3.1 | 8 | 5 Days/ Week | Composite |
| 001A | Total Ammonia as N (mg/L), May | | 2.7 | 8 | 5 Days/ Week | Composite |
| 001A | Whole Effluent Toxicity ("WET"), Chronic (%) | 7-Day chronic *Ceriodaphnia dubia* | -- | NOEC or IC25 ≥ IWC (100%) | Quarterly | 3 Composites / Test |
| | | 7-Day chronic *Pimephales promelas* | -- | NOEC or IC25 ≥ IWC (100%) | | |

9. Pursuant to Part I.D.1. of the Permit, Swift Beef is required to summarize and report the analytical results of its effluent monitoring to the Division via monthly discharge monitoring reports ("DMRs"). Each DMR is to include a certification by Swift Beef that the information provided therein is true, accurate and complete to the knowledge of Swift Beef.

10. Swift Beef's DMRs include, among other information and data, the following effluent data, which exceeded the effluent limitations outlined in Part I.A.2. of the Permit:

| SWIFT BEEF - LONE TREE EFFLUENT SELF-MONITORING DATA | | |
|---|---|---|
| DISCHARGE MONITORING REPORTING PERIOD | SAMPLE MEASUREMENTS FOR OUTFALL 002A | |
| Total Ammonia (mg/L), January | 30-DAY AVG. LIMIT = 3.7 | DAILY MAXIMUM = 8 |
| 1/1/2020 - 1/31/2020 | -- | 15.3 |
| Total Ammonia (mg/L), February | 30-DAY AVG. LIMIT = 3.4 | DAILY MAXIMUM = 8 |
| 2/1/2020 - 2/29/2020 | 4.9 | 24.9 |



| SWIFT BEEF – LONE TREE EFFLUENT SELF-MONITORING DATA | | |
|---|---|---|
| pH | 30-DAY AVG. LIMIT = NA | DAILY MAXIMUM = 6.5 -9 |
| 1/1/2020 - 1/31/2020 | -- | 6.3 |
| Total Ammonia (mg/L), April | 30-DAY AVG. LIMIT = 3.1 | DAILY MAXIMUM = 8 |
| 4/1/2020 - 4/30/2020 | 5.31 | 11.8 |
| Total Ammonia (mg/L), May | 30-DAY AVG. LIMIT = 2.7 | DAILY MAXIMUM = 8 |
| 5/1/2020 - 5/31/2020 | -- | 14.9 |
| WET, Chronic (%), *Ceriodaphnia dubia* | 30-DAY AVG. LIMIT = NA | DAILY MAXIMUM = NOEC or IC25 ≥ IWC (100%) |
| 1/1/2020 - 3/31/2020 | -- | NOEC = 20 IC25 = 17.33 |
| 4/1/2020 - 6/30/2020 | -- | NOEC = 60 IC25 = 73.05 |
| WET, Chronic (%), *Pimephales promelas* | 30-DAY AVG. LIMIT = NA | DAILY MAXIMUM = NOEC or IC25 ≥ IWC (100%) |
| 1/1/2020 - 3/31/2020 | -- | NOEC = 80 |
| 4/1/2020 - 6/30/2020 | -- | NOEC = 20 |

11. Ammonia, pH, and WET are "pollutants," or indicators thereof, as defined by §25-8-103, C.R.S. and its implementing permit regulation 5 CCR 1002-61, §61.2(76).

12. The Permit does not authorize the pollutant levels identified above in Paragraph 10 above. Division records establish that during the reporting periods identified above, Swift Beef did not have any other permit authorizing such discharge into State Waters.

13. Swift Beef's failure to comply with the Permit limitations constitutes violations of Part I.A.1. and I.A.2. of the Permit.

## NOTICE OF VIOLATION

14. Based on the foregoing Findings of Fact and Conclusions of Law, Swift Beef is hereby notified that the Division has determined that Swift Beef has violated the following sections of the Permit.

**Part I.A.1. of the Permit** which states in part: "In accordance with the Water Quality Control Commission Regulations for Effluent Limitations, Section 62.4, and the Colorado Discharge Permit System Regulations, Section 61.8(2), 5 C.C.R. 1002-61, the permitted discharge shall not contain effluent parameter concentrations which exceed the limitations specified below or exceed the specified flow limitation."

**Part I.A.2. of the Permit** which states in part: "In order to obtain an indication of the probable compliance or noncompliance with the effluent limitations specified in Part I.A, the permittee shall monitor all effluent parameters at the frequencies and sample types specified below. Such monitoring will begin immediately and last for the life of the permit unless otherwise noted. The results of such monitoring shall be reported on the Discharge Monitoring Report form (See Part I.D.)." and includes the following effluent limitations table:


COLORADO
Department of Public
Health & Environment

| | | SWIFT BEEF – LONE TREE<br>EFFLUENT DISCHARGE LIMITATIONS | | | | |
| Outfall | Parameter | | Limitation | | Sampling | |
| | | | 30-day Avg. | Daily Max | Frequency | Type |
| 001A | pH | | -- | 6.5 - 9 | 5 Days/ Week | Grab |
| 002A | Total Ammonia as N (mg/L), January | | 3.7 | 8 | 5 Days/ Week | Composite |
| 002A | Total Ammonia as N (mg/L), February | | 3.4 | 8 | 5 Days/ Week | Composite |
| 001A | Total Ammonia as N (mg/L), April | | 3.1 | 8 | 5 Days/ Week | Composite |
| 001A | Total Ammonia as N (mg/L), May | | 2.7 | 8 | 5 Days/ Week | Composite |
| 001A | Whole Effluent Toxicity ("WET"), Chronic (%) | 7-Day chronic *Ceriodaphnia dubia* | -- | NOEC or IC25 ≥ IWC (100%) | Quarterly | 3 Composites / Test |
| | | 7-Day chronic *Pimephales promelas* | -- | NOEC or IC25 ≥ IWC (100%) | | |

## REQUIRED CORRECTIVE ACTION

Based upon the foregoing factual and legal determinations and pursuant to §25-8-602 and §25-8-605, C.R.S., Swift Beef is hereby ordered to:

15. Cease and desist from all violations of the Colorado Water Quality Control Act, §§25-8-101 through 25-8-803, C.R.S., its implementing regulations promulgated thereto and the Permit.

Furthermore, the Division hereby orders Swift Beef to comply with the following specific terms and conditions of this Order:

16. Within 30 calendar days of receipt of this Order, Swift Beef shall submit records of its effluent discharge monitoring and its daily production numbers from January 1, 2019 through the date of this Order. Specifically, Swift Beef shall submit all records for Total Ammonia and WET monitoring, and the daily slaughtered head per day and daily average weight for both cattle and lamb. The Total Ammonia and WET records shall include all laboratory data reports, all field measurement reports, and the date and timing of sample collection. The records shall be summarized in Excel format and shall be clear and understandable.

17. Within 30 calendar days of receipt of this Order, Swift Beef shall retain the services of an individual or entity experienced in industrial wastewater treatment and management to evaluate and recommend Facility improvements that must be implemented by Swift Beef to ensure compliance with the terms and conditions of the Permit. This evaluation shall consider all contributing pollutant sources and pollutant concentrations from all possible wastewater sources, specifically including any wastewater resulting from hide processing, impacts from Swift Beef Processing facility cleaning operations, and wastewater generated at varying production rates. Additionally, the evaluation must specify the residence time of wastewater within the treatment process based on production rate, known percentage of wastewater sources based on production rate (e.g. 60% hide processing and 40% kill floor cleaning), and the timing of processing for identified sources of toxicity.



18. Within 45 calendar days of receipt of this Order, Swift Beef shall provide documentation to the Division that it has retained the services of the individual or entity described in Paragraph 17. The documentation shall include, at a minimum, a copy of the individual or entity's qualifications and a copy of the written contract or agreement for services, including a copy of the scope of services to be provided. The Division reserves the right to reject the individual or entity if it finds, after reasonable inquiry and evaluation, the individual or entity does not meet the expected qualifications. Should the Division deny the individual/entity, Swift Beef will have 14 calendar days from notification from the Division to submit documentation for an alternative individual/entity.

19. Within 90 calendar days of receipt of this Order, Swift Beef shall submit in writing to the Division a final report on the findings of the evaluation identified and outlined in Paragraph 17 above. Along with the findings of the evaluation, the report must identify, for each criterion, specific short-term and long-term measures that will be taken by Swift Beef to rectify deficiencies identified by the evaluation so that the Facility consistently produces effluent in compliance with all the numeric limitations outlined in Part I.A.2. of the Permit. For each short-term and long-term measure identified, Swift Beef shall also submit an aggressive time schedule for completion of each measure. Completion of each measure must occur within 180 days of the final report being submitted to the Division. The measures and time schedule submitted shall become a condition of this Order, and Swift Beef shall implement the measures and time schedule as submitted unless notified by the Division, in writing, that alternate measures and/or time schedules are appropriate. If the Division imposes alternate measures and/or time schedules, they shall also become a condition of this Order.

20. Beginning October 30, 2020, and every calendar month thereafter, Swift Beef shall submit monthly progress reports to the Division by the last day of each calendar month. At a minimum, each report shall outline activities undertaken during the current month and activities planned for the next month to remain in compliance with this Order. The monthly progress reports shall be required until the issuance of written notice from the Division indicating that the reports are no longer necessary occurs.

21. If Swift Beef becomes aware of any situation or circumstances that cause Swift Beef to become unable to comply with any condition or time schedules set forth by this Order, Swift Beef shall provide written notice to the Division within five calendar days of becoming aware of such circumstances. Swift Beef's notice shall describe what, if any, impacts will occur on Swift Beef's ability to comply with the Colorado Water Quality Control Act or Permit CO0027707 and any impacts on the remaining conditions and/or time schedules specified by this Order, and what steps are being taken to mitigate the impacts.

22. All documents submitted under this Order shall use the same titles as stated in this Order, and shall reference both the number of this Order and the number of the paragraph pursuant to which the document is required. Within 30 calendar days of receiving Division comments on submitted documents, Swift Beef shall revise the submitted document(s) to properly address the Division's comments and resubmit the document(s) for Division review.

## NOTICES AND SUBMITTALS

23. For all documents, plans, records, reports and replies required to be submitted by this Order, the Swift Beef shall submit an original and an <u>electronic copy</u> to the Division at the following address:

        Jacob Dyste
        Colorado Department of Public Health and Environment



Water Quality Control Division
Mail Code: WQCD-CWE-B2
4300 Cherry Creek Drive South
Denver, Colorado 80246-1530
Telephone: (303) 692-3290
Email: jacob.dyste@state.co.us

24. For any person submitting documents, plans, records and reports pursuant to this Order, that person shall make the following certification with each submittal:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## OBLIGATION TO ANSWER AND REQUEST FOR HEARING

25. Pursuant to §25-8-603, C.R.S. and 5 CCR 1002, §21.11 Swift Beef is required to submit to the Division an answer affirming or denying each paragraph of the Findings of Fact and responding to the Notice of Violation. The answer shall be filed no later than 30 calendar days after receipt of this action.

26. Section 25-8-603, C.R.S. and 5 CCR 1002, §21.11 also provide that the recipient of a Notice of Violation may request the Division to conduct a public hearing to determine the validity of the Notice, including the Findings of Fact. Such request shall be filed in writing with the Division and include the information specified in 5 CCR 1002, §21.4(B)(2). Absent a request for hearing, the validity of the factual allegations and the Notice of Violation shall be deemed established in any subsequent Department proceeding. The request for hearing, if any, shall be filed no later than 30 calendar days after issuance of this action. The filing of an answer does not constitute a request for hearing.

## FALSIFICATION AND TAMPERING

27. Be advised, in accord with §25-8-610, C.R.S., that any person who knowingly makes any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under the Colorado Water Quality Control Act or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this article is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than ten thousand dollars, or by imprisonment in the county jail for not more than six months, or by both such fine and imprisonment.

## POTENTIAL CIVIL AND CRIMINAL PENALTIES

28. Swift Beef is also advised that any person who violates any provision of the Colorado Water Quality Control Act ("Act"), §§25-8-101 to 803, C.R.S., or of any permit issued under the Act, or any control regulation promulgated pursuant to the Act, or any final cease and desist order or clean-up order



issued by the Division shall be subject to a civil penalty of not more than ten thousand dollars per day for each day during which such violation occurs. Further, any person who recklessly, knowingly, intentionally, or with criminal negligence discharges any pollutant into any state waters commits criminal pollution if such discharge is made without a permit, if a permit is required by the Act for such discharge, or if such discharge is made in violation of any permit issued under the Act or in violation of any Cease and Desist Order or Clean-up Order issued by the Division. By virtue of issuing this Order, the State has not waived its right to bring an action for penalties under §§25-8-608 and 609, C.R.S, and may bring such action in the future.

## RELEASE OR DISCHARGE NOTIFICATION

29. Pursuant to §25-8-601, C.R.S., Swift Beef is further advised that any person engaged in any operation or activity which results in a spill or discharge of oil or other substance which may cause pollution of the waters of the state, shall notify the Division of the discharge. If said person fails to so notify, said person is guilty of a misdemeanor, and may be fined or imprisoned or both.

## EFFECT OF ORDER

30. Nothing herein contained, particularly those portions requiring certain acts to be performed within a certain time, shall be construed as a permit or license, either to violate any provisions of the public health laws and regulations promulgated thereunder, or to make any discharge into state waters. Nothing herein contained shall be construed to preclude other individuals, cities, towns, counties, or duly constituted political subdivisions of the state from the exercise of their respective rights to suppress nuisances or to preclude any other lawful actions by such entities or the State.

31. For further clarification of Swift Beef's rights and obligations under this Order Swift Beef is advised to consult the Colorado Water Quality Control Act, §§25-8-101 to 803, C.R.S., and regulations promulgated thereunder, 5 CCR 1002.

Issued at Denver, Colorado, this 6th day of August, 2020.

## FOR THE COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

Nathan T. Moore
Digitally signed by Nathan T. Moore
Date: 2020.08.06 14:42:29 -06'00'

Nathan Moore
Clean Water Compliance and Enforcement Section Manager
WATER QUALITY CONTROL DIVISION



# EXHIBIT D

COMMITMENT & INTEGRITY
DRIVE RESULTS

575 E. Swedesford Road | Suite 102
Wayne, Pennsylvania 19087
www.woodardcurran.com

T 800.426.4262



# MEMORANDUM

TO:      Mark Ritsema, Swift Beef Company
         Fernando Meza, Swift Beef Company

FROM:    Ed Helmig, Woodard & Curran
         Domagoj Gotovac, P.E., Woodard & Curran
         Susan Ambler, P.E., Woodard & Curran
         Elyse Dumas, Woodard & Curran

DATE:    November 4, 2020

RE:      Swift Beef Company Greeley, CO WWTF Evaluation
         Report of Findings Pursuant to CDPHE Notice of Violation Number: 10-200806-1

---

This report summarizes findings pursuant to Colorado Department of Public Health and Environment (CDPHE) Notice of Violation/Cease and Desist Order (NOV/CDO) Number: 10-200806-1.

## 1.0    Executive Summary

Woodard & Curran (W&C) has completed a preliminary evaluation of the Swift Beef Company (JBS) Wastewater Treatment Facility (WWTF) with regards to alleged intermittent non-compliance with effluent ammonia, pH, and whole effluent toxicity (WET). The key findings of this evaluation are as follows:

1. The JBS site owns and operates a sophisticated WWTF consisting of 10 major unit processes, a separate pretreatment system, and a separate Zero Liquid Discharge (ZLD) system. The heart of the WWTF system consists of low-rate anaerobic reactors for organics (chemical oxygen demand and biochemical oxygen demand, or COD/BOD) removal and a Modified Ludzack-Ettinger (MLE) process for nitrification/denitrification (as well as further organics removal).

2. It is generally understood that in industrial wastewater treatment practice, plants like the JBS WWTF periodically experience a loss of nitrification resulting in high effluent ammonia values. This is due primarily to the complexity and sensitivity of this process to upset, particularly relative to temperature, pH and alkalinity.

3. The JBS WWTF requires upgraded instrumentation and process controls, including flow or mass flow measurement and control for biomass wasting (WAS), Return Activated Sludge ($Q_r$ or RAS) and Internal MLSS Recycle Flows, $Q_i$.

4. WWTF system reliability for ammonia removal is directly related to the ability to accurately measure and control the sludge age, or solids retention time (SRT), in the MLE System. Strict control of sludge age is the single most important process control parameter for an MLE System.

5. High organics removal in the anaerobic reactor may be contributing to or causing the downstream MLE system to be deficient in *readily biodegradable* carbon. It is not uncommon for this to occur in such WWTF systems and the use of a readily degradable external carbon source (such as methanol) is commonly implemented as a solution to supplement influent loading to the MLE system.

**Table 4** of this report identifies 13 potential causes, recommendations and action items aimed toward improving the quality of JBS's effluent ammonia and toxicity. W&C interprets the NOV/CDO's single pH



exceedance as an outlier and based on our review of operating data, we do not view pH non-compliance as an ongoing trend.

## 2.0    Background

JBS operates a beef plant in Greeley, CO. Wastewater generated from facility operations is treated through an onsite pre-treatment plant before additional treatment at the Lone Tree WWTF[1] and discharge to Lone Tree Creek via CDPHE Colorado Discharge Permit System (CDPS) Permit No. CO0027707.

JBS received a NOV/CDO from the CDPHE's Water Quality Control Division on August 6th, 2020 containing alleged violations to effluent total ammonia, chronic WET for *Ceriodphnia dubia* (Water Flea) and *Pimephales promelas* (Fathead Minnow), and effluent pH. Pursuant to NOV/CDO paragraphs 17 through 19, JBS must:

1.  Retain the services of an individual or entity experienced in industrial wastewater treatment and management to evaluate and recommend Facility improvements that must be implemented by JBS to ensure compliance with the terms and conditions of the Permit. JBS must provide to the Division that it has retained the services of such entity within 45 days.

2.  Submit a final report on the findings of the evaluation identified and outlined in NOV/CDO Paragraph 17, which must also identify specific short-term and long-term measures that will be taken by JBS to ensure the Facility consistently produces effluent in compliance with all permit limitations. JBS shall also submit a schedule for completion of each short and long-term measure so that the completion of each measure must occur within 180 days of the final report being submitted to the Division.

JBS has contracted with Woodard & Curran, Inc. (W&C) to evaluate and recommend improvements at the JBS Greeley, CO facility. On Wednesday, September 30th, 2020, a member of W&C's industrial waste treatment team visited JBS's Greeley pretreatment facility, hide processing wastewater treatment facility, and the Lone Tree WWTF. The tour included interviews with wastewater treatment staff, examination of all unit processes, and reviews of various levels of operational control currently in place (sampling, SCADA system feedback, etc.). W&C's site visit and subsequent engineering work included an evaluation of contributing pollutant sources and concentrations that have the potential to impact JBS's wastewater treatment performance and the ability to consistently maintain permit compliance.

This report addresses the requirements set forth by NOV/CDO Paragraph 19, summarized in item 2 above. Subsequent sections present findings from W&C's WWTF evaluation, recommended short-term and long-term measures, and a time schedule for the completion of each measure.

## 3.0    WWTF Evaluation

The following subsections summarize W&C's findings from the JBS Greeley, CO WWTF evaluation with respect to potential pollutant sources, Detention Time (DT) within the treatment processes, and important key performance indicators for successful WWTF operation.

---

[1] The Lone Tree WWTF also processed wastewater from a lamb processing facility during the time period covered by the NOV. The lamb plant has since closed.

### 3.1   General Process Overview



The JBS Treatment System consists of the following major unit processes:

**Table 1: Major Unit Processes, JBS WWTF in Greeley, CO.**

| Unit Process No. | Unit Process | Function |
|---|---|---|
| 1 | Screening | Removal of coarse solids. |
| 2 | Equalization | Balancing of flows, loads and attenuation of potentially toxic or inhibitive pollutants (sanitizers) and pH. Prevention of shock loads to biological processes. |
| 3 | Dissolved Air Flotation (DAF) | Removal of fats, oils and grease as well as suspended solids. |
| 4 | Grease Recovery | Recovery of grease. |
| 5 | Anaerobic Lagoons | Reduction in carbon-based organics (COD and BOD) and hydrolysis of protein and amino acids to free and saline ammonia (FSA). |
| 6 | MLE System | Reduction of Total Nitrogen via a denitrification and nitrification process using anoxic and aerobic biological reactors. Additional organics removal. |
| 7 | Clarifiers | Separation of biological solids from treated effluent and return and wasting of settled solids to achieve a system solids balance, including an SRT designed to retain a robust population of nitrifying bacteria. |
| 8 | WAS Storage Lagoons | Storage and stabilization of waste activated sludge (WAS). |
| 9 | Storage Ponds | Attenuation of residual pollutants in final effluent prior to discharge. |
| 10 | Disinfection | Log reduction of pathogenic bacteria via chlorination. |
| 11 | ZLD System | Treatment of hide processing wastewater and brine. Hide processing wastewater does not discharge to the JBS pretreatment facility nor the Lone Tree WWTF and keeps refractory materials including salt (TDS) out of the biological wastewater treatment system. |

Unit processes one through four are located at the wastewater pre-treatment system at JBS's production facility in Greeley, CO. Unit process number 11, a ZLD System associated with the treatment of hide processing wastewater and brine, is located in a separate area from the pre-treatment system. Unit processes five through 10 are located at the Lone Tree WWTF approximately seven miles away from the wastewater pretreatment system. A Process Flow Diagram (PFD) for the wastewater pretreatment and Lone Tree WWTF is included as **Attachment 1**. Note that this PFD does not include the ZLD System for hide processing.

As shown on the WWTF PFD, JBS's wastewater treatment process is a relatively large and complex industrial treatment system involving primary, secondary and tertiary treatment, including disinfection. Although wastewater treatment via the Modified Ludzack-Ettinger (MLE) process is a proven technology



for total nitrogen removal, a successful operation requires attention to, and optimization of, multiple key parameters including: temperature, pH, alkalinity, the TKN/COD ratio, sludge age, oxygen status (an anoxic reactor without the presence of free molecular oxygen as dissolved $O_2$ vs. bound oxygen as $NO_2$ or $NO_3$, and excess levels of dissolved oxygen in the aerobic reactor), nutrient balance, recycle rates (for anoxic or internal recycle, $Q_i$, and biomass recycle from the clarifier, $Q_r$), biomass quality and health, and the absence of toxics. The absence of compounds including biocides and sanitizers is particularly important, as these compounds could inhibit sensitive nitrifiers and cause the system to perform at a lower rate such as *Haldane* vs. normal or *Monod* growth kinetics.

Additional information surrounding these key performance indicators are found in subsequent sections, along with any recommended measures to optimize the WWTF according to best practices.

## 3.2    Effluent Total Ammonia

While the NOV/CDO addresses alleged exceedances for effluent Total Ammonia, Whole Effluent Toxicity (WET) and pH, this evaluation section focuses primarily on high effluent Total Ammonia (Free and Saline Ammonia, or FSA) and the short-term actions that can be readily implemented to achieve improvements in effluent quality, aimed toward full Total Ammonia compliance. These short-term actions focus on treatment plant operation and equipment modifications that lend to a more reliable ammonia removal process.

W&C recognizes that ionized ammonia (also known as saline ammonia, ammonium, or $NH_4^+$) and unionized ammonia (or free ammonia, $NH_3$) concentrations in treated effluent are often a source of acute and chronic WET, especially by unionized ammonia, though the form of ammonia present will vary by water temperature and pH.

While cognizant of the WET and pH concerns, W&C's immediate goal is to focus on optimizing and improving the reliability of the MLE process first, then proceeding with the task of identifing potential sources of WET. MLE performance optimization may in fact mitigate, or resolve, WET issues if they are related to effluent FSA. In **Figure 1** we can see the relationship among Total Ammonia (or FSA), pH and Chronic Toxicity for various aquatic species including *C. Dubia* (Water Flea) and *Pimephales* (Fathead Minnow).

**Figure 1: FSA vs. pH vs. Chronic Toxicity (or Criterion Continuous Concentration/CCC), USEPA 1999.**





### 3.3   Pollutant Sources

Primary pollutant sources in the meat processing industry include manure, blood, dirt and hair, paunch content and liquor, process liquor, flesh, and fat (grease). Blood has a COD of about 400,000 mg/L and is the major source of high strength effluent along with flesh and paunch, which are high in organic nitrogen (protein and amino acids) and urea, which decompose to FSA via hydrolysis in the anaerobic treatment reactor. Other sources of pollution include cleaning and sanitization operations and utilities blowdowns.

Cleaning and sanitization chemicals can be toxic or inhibitive to biomass, including nitrifiers in the MLE process, and can also be a source of WET. JBS and W&C have initiated a preliminary evaluation of this category of chemicals to determine which products require further investigation. This work commenced in October 2020, starting with the collection and review of the Safety Data Sheets (SDS) for the 10 largest use chemicals employed at the JBS site by mass. The products under further investigation are listed below, ranked in order of highest annual use on a mass basis:

1. PF-35H
2. Acid Lactic FCC 88%

3. Antimicrobial CL2180
4. PC-622 PAA 22%
5. Sodium Hypochlorite 12.5%
6. FM-7060
7. FM-7910
8. BirkoSide 22
9. Liquik Bleach
10. Synchlorozene

Upon initial review of the product ingredients, W&C selected seven of the 10 products for further review. The remaining three products (12.5% bleach, and two lactic acid products) were discounted from further investigation due to low risk. Of the remaining seven products, W&C flagged two as having significant risk to biomass and/or aquatic organisms (FM-7910 and Synchlorobenzene). These products will be subject to a more in-depth evaluation to confirm any potential toxic effects during wastewater treatment or discharge. W&C also flagged one product (FM-7060) as moderate risk to biomass and/or aquatic organisms, which will also be subject to further review. Lastly, W&C flagged one additional product (PF-35 H) as low risk and highly water soluble, but because the product contains a potential endocrine disruptor it will also be subject to further evaluation. The remaining three products (of the seven selected for further review) were deemed low risk for various reasons, including the fact that they are readily biodegradable and/or become non-toxic immediately upon dilution.

Subsequent evaluations will investigate the use, handling, and discharge of these products (if applicable) to the Lone Tree WWTF to determine any potential impacts for WET. Further evaluation requires additional literature search relative to Fate and Effects (F&E), dilution calculations, and potential testing involving respirometry of aquatic toxicity methods.

## 3.4 Operations and Flows vs Detention Time

Pursuant to NOV/CDO requirements outlined in paragraph 17, W&C performed an evaluation to specify the residence time of wastewater within the treatment process based on production rate, known wastewater sources, and timing of identified sources of toxicity. This evaluation established a relationship between wastewater flows and Detention Time for different wastewater treatment unit processes under various operations at the JBS site. W&C is using the definition of DT as defined and illustrated in the textbook *Applied Math for Wastewater Plant Operators*, where DT is defined as follows:

*Detention Time is the length of time required for a given flow rate to pass through a tank.*

In this case, the given or influent flow rate is Q, and the Detention Time (DT) equals the Volume of Tank (gallons) divided by Q (gallons per time). Typical daily flow rates (in MGD, million gallon per day) for various processes during JBS operation are established in **Table 2**.

### Table 2: Typical Operations Flow Rates

| Plant Area | Production Day Wastewater Flow (MGD) | Non-Production Day Wastewater Flow (MGD) |
|---|---|---|
| Cattle Pens | 0.1 | 0.05 |
| Harvest Floor | 1.1 | 0.2 |
| Coolers | 0.25 | 0.2 |
| Fabrication Floor | 0.65 | 0.2 |
| Rendering | 0.2 | 0.01 |



| Plant Area | Production Day Wastewater Flow (MGD) | Non-Production Day Wastewater Flow (MGD) |
|---|---|---|
| Wastewater Pretreatment | 0.08 | 0.01 |
| Boilers/Refrigeration | 0.11 | 0.05 |
| **Beef Plant Sum/Avg:** | **2.49** | **0.72** |
| Lamb Plant* | 0.32 | 0.05 |
| Hides** | 0.01 | 0.005 |
| *Lone Tree Influent Sum/Avg:* | *2.49* | *0.72* |

*Lamb Plant discontinued operations late July 2020.
** Wastewater is not discharged to Lone Tree WWTF.

The following figure shows the relationship between influent flow to the Lone Tree WWTF (MGD), daily kill weight (lbs./day), and the dates of alleged non-compliant samples for effluent ammonia (yellow circles) and WET (green triangles). The y-axis for the alleged non-compliant samples denotes the influent wastewater flow for that day.

**Figure 2: Influent Flow vs. Kill Weight vs. Non-Compliant Effluent Ammonia and Effluent Toxicity Samples**



**Figure 2** depicts a close relationship between influent flow and daily kill weight. The notable drop in both flow and daily kill rate during the months of March, April and early May of 2020 correspond to production abnormalities due to the onset of local COVID-19 cases.

Information on working volumes of JBS's wastewater treatment unit processes is included in **Attachment 2**. Using this information, W&C's DT evaluation for key WWTF processes is summarized in **Table 3** below.

**Table 3: Detention Time Evaluation**

| Unit Process | DT (without Lamb Plant) | DT (with Lamb Plant[2]) | Unit |
|---|---|---|---|
| *Production Day* | | | |
| Anaerobic Treatment[1] | 4.3 | 3.8 | days |
| Anoxic Reactor | 0.7 | 0.6 | days |
| Aerobic Reactor | 1.4 | 1.3 | days |
| *Non-Production Day* | | | |
| Anaerobic Treatment[1] | 14.8 | 13.9 | days |
| Anoxic Reactor | 2.5 | 2.3 | days |
| Aerobic Reactor | 4.9 | 4.6 | days |

[1] This calculation assumes 33% of the working capacity of anaerobic lagoons is occupied by the anaerobic sludge layer.
[2] Lamb Plant discontinued operations late July 2020.

This DT evaluation could be used to establish whether certain operations are overloading the WWTF – particularly the MLE process such that high flows or loads could cause or contribute to the wash out of nitrifiers. Wash out occurs when the SRT in the reactor is less than the maximum specific growth rate of nitrifiers at the reactor operating temperature; therefore, SRT is, in our opinion, more relevant than Detention Time for MLE system performance as a key design and operating parameter. Furthermore, the effect of the Internal Recycle ($Q_i$) from the aerobic to anoxic segments of the MLE process and the Return Activated Sludge (RAS) or $Q_r$ can have significant impact as shown in **Figure 3**.

**Figure 3: Denitrification Based on Recycle to Initial Anoxic Zone (ex. MLE Process) [14]**





Note that one risk of a high recycle rate includes the return of dissolved oxygen back to the anoxic reactor, which inhibits or stops the denitrification reaction; therefore, WWTF operators must be careful not to run the $Q_i$ too high.

**Sludge Age:** At SRTs lower than the minimum required for nitrification, nitrifiers are washed out of the system and ammonia removal by nitrification is no longer possible. Furthermore, the effect of temperature is particularly strong and for every 6°C drop in temperature, the maximum specific growth rate for nitrifiers decreases by 50%, which would require the SRT to double. For this reason, strict tracking and control over SRT is critical to the successful performance of nitrification systems.

Maintaining steady SRTs is complicated by non-steady state loading conditions for both organics and FSA. These conditions require that WWTF operators allow MLVSS levels to vary, but not such as to exceed the oxygen transfer capabilities of the aeration system and/or cause settleability problems in the clarifiers, nor jeopardize the BOD removal performance.

Additionally, the growth rate of nitrifiers is unique to every wastewater and the type of nitrogen components present in that wastewater, and the growth rate is strongly suppressed outside of a nitrification reactor pH range of 7.0 to 8.0 S.U.

## 3.5   Key Performance Indicators

W&C has evaluated the KPI's identified **Section 3.1** of this report, plus three additional parameters of interest. **Table 4** summarizes our preliminary findings and recommended corrective measures.

**Table 4: Potential Causes of Loss of Ammonia Removal Performance**

| Item No. | Parameter | Probability of Cause | Insights | Impact | Recommendation | Action Items |
|---|---|---|---|---|---|---|
| 1 | Temperature | Low | Strongly affects nitrifier growth rate and potential for wash out. | Wash out of nitrifiers as cold front arrives or during plant shut down (holidays) | Consider and mitigate potential for short-term temperature swings in MLE system | Update WWTF SOP/O&M Manual. Continue to collect regular 4-hour temperature samples of MLE reactors. |
| 2 | pH | Low | Must be tightly controlled. Plant only has limited control to bring pH down if above 8 S.U. | Nitrification is strongly suppressed outside a pH between 7-8 S.U. | Continue reactor pH monitoring. Acid addition not necessary based on data review of lack of high pH. | Continue to collect regular 4-hour pH samples of MLE reactors. |
| 3 | Alkalinity | Medium | Alkalinity control is currently achieved by a temporary system and may not meet the demands of the MLE process. | Inhibition of nitrification | Evaluate alkalinity in anoxic and aerobic reactors. Consider alkalinity feed forward control. | Temporary alkalinity control evaluation added to corrective measure plan and schedule. Following expected changes to JBS's NPDES permit for new Nitrogen and Phosphorus limits, evaluate permanent changes to alkalinity control. |
| 4 | TKN/COD | Medium | Anoxic reactor requires readily biodegradable carbon source. | Loss of denitrification and alkalinity recovery | Evaluate anaerobic bypass vs supplemental readily biodegradable carbon source. | Anaerobic bypass and/or supplemental carbon source evaluated as part of alkalinity control evaluation. See Action Item for Item No. 3. |
| 5 | DT | Medium | If DT is lower than substrate utilization rates for BOD and Ammonia then permit limits may be exceeded. | Loss of COD/BOD and TKN removal performance | Confirm that operating DTs are sufficient for required literature organics and TKN removals, including a recommended 30% margin of safety. Implement anaerobic lagoon effluent flow measurement to accurately report flow to MLE process. | Anaerobic lagoon effluent flow measurement implementation added to corrective measure plan and schedule. VWC to calculate DT with respect to Nitrification Efficiency. |
| 6 | Sludge Age (SRT) | High | Unable to accurately measure and control SRT. | Periods of excessive wasting to control MLVSS result in wash out. | Evaluate Hydraulic Control of SRT using mass flow meter or flow x concentration approach. Determine minimum theoretical SRT (winter and summer) for complete nitrification and optimum recycle rate (Q_i) for denitrification. Include safety factor in calculations. | Update WWTF SOP/O&M Manual for improved operational and procedural measures. For sludge management, JBS has procured a larger belt press for improved sludge management capacity. Add KPI calculations, including recommendations for SRT, to corrective measure plan and schedule. |
| 7 | Oxygen/ORP | Medium | Free molecular oxygen recycle (Q_i) from the aerobic to the anoxic basin will inhibit or shut down the denitrification process. | Loss of denitrification performance. | Consider installing ORP probe and alarm in anoxic reactor. | JBS shall initiate regular, manual measurements of anoxic reactor ORP. JBS to consider permanent ORP instrument for continuous data collection and alarming. ORP measurements shall be added to WWTF SOP/O&M Manual. |
| 8 | Nutrient Balance | Low | Aerobic reactor must have 100:5:1 C:N:P | Loss of performance | Target 100:5:1 C:N:P Ratio at aerobic reactor | Add target KPI to WWTF SOP/O&M Manual. |
| 9 | Recycle Rates | Low | Unable to accurately measure and control RAS from clarifiers (Q_i) and recycle from aerobic to anoxic reactors (Q_i). | Loss of nitrification/denitrification performance. | Repair RAS and MLE Return flow meters. | RAS and MLE Return flow meter repair added to corrective action measure plan and schedule. |
| 10 | Biomass Health | Low | Perform weekly microscopic examination of biomass. Conduct daily DOUR and SOUR tests | Establish metrics for healthy vs unhealthy biomass as leading indicators for potential upset or pending loss of performance. | Consider baseline biomass health assessment and provisions for emergency or cold weather/stress related bioaugmentation | Provisions for emergency or stress related bioaugmentation already in place. Expand WWTF SOP/O&M Manual to note weekly microscopic examination of biomass. |
| 11 | Toxics (Biomass) | Low | Sanitizers are designed to kill microorganisms and if present in high enough concentration they will kill or inhibit nitrifiers. Chlorine disinfection can generate toxic byproducts High nitrite concentrations can interfere with disinfection and cause violations of effluent bacteria limits, resulting potentially in whole effluent toxicity (WET) failures, and cause effluent pH violations. An abnormal increase in secondary effluent nitrite is referred commonly as "nitrite lock." | Inhibition of nitrification process. Reaction with downstream chlorination process. WET failure. | Evaluate benefit of an analyzer such as the LAR Nitritox Toxicity Analyzer with detect and divert capability. | Conduct follow-up SDS evaluation for the products identified in Section 3.3. |
| 12 | Other: excessive solid loss via clarifiers | Low | Particle-bound TKN in effluent that eventually converts to ammonia | Loss of performance, high effluent ammonia | Continue regular sampling for solids detection in clarifier effluent. | Update WWTF SOP/O&M Manual for clarifier upset response and expanded data collection requirements following upsets. |
| 13 | Other: operator Training and O&M Manual | High | JBS WWTF is complex and requires high skill level including deep process knowledge | Human error, loss of performance | Update O&M Manual and provide JBS WWTF Specific operator training program | Updated WWTF SOP/O&M Manual added to corrective action measure plan and schedule. |

Woodard & Curran, Inc.
November 4, 2020
JBS (0223432.00)
2020.11.04 Phase II Report_Final



COMMITMENT & INTEGRITY
DRIVE RESULTS

575 E. Swedesford Road | Suite 102
Wayne, Pennsylvania 19087
www.woodardcurran.com

T 800.426.4262



## 4.0    Corrective Measures and Compliance Schedule

Based on the WWTF Evaluation summarized in **Section 3**, W&C recommends implementing actions associated with items in **Table 4** in order to meet effluent compliance. In summary, these corrective measures are:

1.  Regularly sample ORP in the anoxic reactor and consider installing an ORP probe for continuous readings and alarming. Consider ammonia and nitrate analyzers to assist in process control.

2.  Evaluate alkalinity control in anoxic and aerobic reactors. Include evaluation for anaerobic bypass vs supplemental readily biodegradable carbon source to anoxic reactor.

3.  Implement anaerobic lagoon effluent flow measurement to accurately report flow to MLE process. Repair RAS and MLE Return flow meters.

4.  Determine minimum theoretical SRT (winter and summer) for complete nitrification and optimum recycle rate ($Q_i$) for denitrification. Evaluate Hydraulic Control of SRT and install upgraded belt press for improved sludge management capacity.

5.  Update WWTF SOP/O&M Manual to address the recommendations included in **Table 4** and provide JBS specific operator training program.

6.  Follow up initial SDS evaluation with expanded evaluation per **Section 3.3** and toxicity study as needed.

These measures are intended to provide more accurate information on the WWTF so JBS can better operate and optimize wastewater treatment prior to discharge. A compliance schedule for these measures is included as **Attachment 3** to this report.

## 5.0    References

1.  Chen, G; Van Loosdrecht M; Ekama, G; Brdjanovic, D.(2020). *Biological Wastewater Treatment*, IWA Publishing.
2.  Henze, M.; Gujer, W.; Mino, T; Van Loosdrecht, M. (2000). *Activated Sludge Models ASM1, ASM2, ASM2d, and ASM3. IWA Task Group on Mathematical Modeling for Design and Operation of Biological Wastewater Treatment*. IWA Publishing.
3.  Eckenfelder, W.; Ford D.; Englande, A. (2009). *Industrial Water Quality*, 4th Edition. McGraw Hill.
4.  Wang L., Hung, Y., Lo, H., Yapijakis, C. (2006). *Waste Treatment in The Food Processing Industry.* Taylor and Francis.
5.  Tchobanoglous, G. ;Burton F. Stensel, H. (2003). *Wastewater Engineering, Treatment and Reuse*, Metcalf and Eddy- 4th edition.
6.  Capodaglio A.; Hlavinek, P; Raboni, M. 2016. *Advances in Wastewater Nitrogen Removal by Biological Processes: State of the Art Review*. Ambiente & Agua and Interdisciplinary Journal of Applied Science Vol. 11 No.2 pp 250-267.
7.  *Wastewater Treatment Fact Sheet: External Carbon Sources for Nitrogen Removal*. August 2013. USEPA.
8.  *Nutrient Control Design Manual*: *State of Technology Report* (January 2009). USEPA-EPA/600/R-09/012
9.  Google Search Results: *Anoxic Treatment Systems-Operation, Cost and Troubleshooting*. Tyson Foods https://www.meatinstitute.org/index.php?ht=a/GetDocumentAction/i/48700.
10. USEPA: *Nutrient Control Design Manual* (August 2010). EPA/600/R-10/100.



11. USEPA: *1999 Update of Ambient Water Quality Criteria for Ammonia*. (1999). EPA-822-R-99-04.

12. Kirkpatrick, J.P.; *Applied Math for Wastewater Plant Operators-Second Edition* (1991). Technomic Publishing.

13. Minnesota Pollution Control Agency: *Biological Nutrient Removal* (2011).

14. Scuras, S. (2014). *Process Control for Improved Nitrogen Removal*. NC AWWA-WEA 94th Annual Conference.

**ATTACHMENT 1 – JBS WASTEWATER TREATMENT PROCESS FLOW DIAGRAM**





**ATTACHMENT 2 – DETENTION TIME CALCULATIONS**



| | |
|---|---|
| **Project** | JBS Greeley WWTP & WET Evaluation |
| **Project No.** | 233432 |
| **Engineer** | EDumas |
| **Checked By** | Ehelmig |
| **Date** | 10/26/2020 |
| **Rev** | 2 |

**Sources and References:**

JBS USA, LLC. "*Wastewater_Flow Diagram_Greeley CO_EX-02* ", 2009. Drawing No. EX-02. Provided to W&C in October 2020.

CDPHE. "*Service of Notice of Violation / Cease and Desist Order, Number: 10-200806-1* ", August 6th, 2020. Provided to W&C in October 2020.

**Objectives:**

"This evaluation shall consider all contributing pollutant sources and pollutant concentrations from all possible wastewater sources, specifically including any wastewater resulting from hide processing, impacts from Swift Beef Processing facility cleaning operations, and wastewater generated at varying production rates. Additionally, the evaluation must specify the residence time of wastewater within the treatment process based on production rate, known percentage of wastewater sources based on production rate (e.g. 60% hide processing and 40% kill floor cleaning), and the timing of processing for identified sources of toxicity."

**Assumptions:**

Green cells are user inputs, yellow cells are calculated outputs

All unit process volumes from PFD Drawing EX-02 are accurate and representative of current conditions

MLE DT calculations use influent flow measurement to Lone Tree WWTF

**Calculations:**

| WWTP Unit Process | Working Volume | Units | Notes |
|---|---|---|---|
| Anaerobic Lagoons | 10.7 | MG | (x4) lagoons, each approx. 4 MG. Assumed 33% of working capacity is occupied due to sludge layer. |
| Anoxic Cells | 1.8 | MG | (x2) cells, each approx. 0.9 MG |
| Aeration Basins | 3.54 | MG | (x2) basins, each approx. 1.77 MG |
| Aerobic Ponds | 55 | MG | (x2) ponds, Pond 1 = 39 MG, Pond 2 = 16 MG |

| Plant Area | Production Day WW Flow, MGD | Non-Prod. Day WW Flow, MGD |
|---|---|---|
| Cattle Pens | 0.1 | 0.05 |
| Harvest Floor | 1.1 | 0.2 |
| Coolers | 0.25 | 0.2 |
| Fabrication Floor | 0.65 | 0.2 |
| Rendering | 0.2 | 0.01 |
| Wastewater Pretreatment | 0.08 | 0.01 |
| Boilers/Refrigeration | 0.11 | 0.05 |
| **Beef Plant Sum/Avg:** | **2.49** | **0.72** |
| Lamb Plant* | 0.32 | 0.05 |
| Hides** | 0.01 | 0.005 |
| **Lone Tree Influent Sum/Avg:** | **2.49** | **0.72** |

*Lamb Plant discontinued operations late July 2020

** Sanitary sewer (i.e., non-industrial ww)

**Results:**

| Unit Process | DT (without Lamb Plant) | DT (with Lamb Plant) | Unit |
|---|---|---|---|
| Anaerobic DT, Production Day | 4.3 | 3.8 | days |
| Anaerobic DT, Non-Production Day | 14.8 | 13.9 | days |
| Anoxic DT, Production Day | 0.7 | 0.6 | days |
| Anoxic DT, Non-Production Day | 2.5 | 2.3 | days |
| Aerobic DT, Production Day | 1.4 | 1.3 | days |
| Aerobic DT, Non-Production Day | 4.9 | 4.6 | days |



**ATTACHMENT 3 – CORRECTIVE MEASURES AND COMPLIANCE SCHEDULE**





JBS Greeley, CO
Corrective Actions and Compliance Schedule

| ID | Task Name | Duration |
|---|---|---|
| 0 | **Proposed Corrective Action Schedule** | **420 days** |
| 1 | **Corrective Action Deadline** | **180 days** |
| 4 | **Instrumentation and Controls (Note 1)** | **180 days** |
| 5 | Implement Anaerobic Effluent Flow Measurement | 180 days |
| 6 | Repair RAS and MLE Return Flow Meters | 180 days |
| 7 | **Data Gathering** | **30 days** |
| 8 | Expand Alkalinity Sampling | 30 days |
| 9 | Collect regular samples/readings for MLVSS, ORP, and other data required for KPI | 30 days |
| 10 | **Engineering Evaluations** | **60 days** |
| 11 | SDS Evaluation | 60 days |
| 12 | Evaluate Alkalinity Control and Anaerobic Bypass vs. Supplemental Carbon | 42 days |
| 13 | **WWTF Operations (Note 2)** | **120 days** |
| 14 | Update O&M Manual | 120 days |
| 15 | Conduct WWTF Operator Training | 42 days |
| 16 | **Optional Tasks** | **420 days** |
| 17 | Add Optional Anoxic ORP Sensor and Alarm | 120 days |
| 18 | Consider Ammonia and Nitrate Analyzers to Assist in Process Control | 120 days |
| 19 | Respirometry or Bioreactor Study | 120 days |
| 20 | Toxicity Evaluation (Short Duration Outcome) | 180 days |
| 21 | Toxicity Evaluation (Extended Duration Outcome) | 180 days |
| 22 | Calculate WWTF KPIs | 120 days |

Notes:
1. Instrumentation and Controls duration includes instrumentation specification, procurement, installation and commissioning.
2. Operational measures best completed after KPI calculations.
3. The proposed schedule may need to be adjusted due to impacts beyond JBS's control, such as delays associated with the current COVID-19 Pandemic.

Project: Proposed Corrective Ac
Date: Wed 11/4/20

Task | Milestone | Summary | Project Summary | Inactive Task | Manual Task | Rolled Up Milestone ◇

Page 1

# EXHIBIT E



PUBLIC JUSTICE
IMPACT. CHANGE.

October 1, 2019

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

JBS-Swift Beef Company
800 North 8th Ave.
Greeley, Colorado 80631

Andre Nogueira
President and Chief Executive Office
JBS USA
1770 Promontory Circle
Greeley, Colorado 80634

Re:    Notice of Violations and Intent to Sue under the Clean Air Act

Through counsel at Public Justice, the Center for Biological Diversity and Food & Water Watch hereby notify you of their intent to file civil litigation against JBS-Swift Beef Company and JBS USA (collectively "JBS-Swift Beef") over ongoing violations of the Clean Air Act, or CAA. JBS-Swift Beef is the owner and/or operator of the cattle slaughter and beef processing facility, known as the Greeley Integrated Rendering Plant (the "Plant"), located at 800 North 8th Street in Greeley, Colorado. JBS-Swift Beef is responsible for the Plant's air emissions and operates the Plant under an air permit known as Permit No. 95WE757 (the "Air Permit"), which was issued by the Air Pollution Control Division (APCD) of the Colorado Department of Public Health and Environment. The Air Permit covers several points of emission at the Plant. As detailed below, JBS-Swift Beef is violating terms and conditions of the Air Permit and accordingly the Clean Air Act. At the expiration of sixty days from the date of this letter, the Center for Biological Diversity and Food & Water Watch intend to file suit under the CAA's citizen suit provision, 42 U.S.C. § 7604(a), and will seek declaratory and injunctive relief, civil penalties, and all other relief authorized by law.

## I.    CLEAN AIR ACT REQUIREMENTS

The Clean Air Act is designed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1). It requires the Environmental Protection Agency (EPA) to establish primary and secondary national ambient air quality standards (or NAAQS) for those pollutants that EPA has issued air quality criteria. 42 U.S.C. §§ 7408, 7409. Ground-level ozone pollution—commonly referred to as smog—results when airborne "volatile organic compounds" (VOCs) and nitrogen oxides react with sunlight. EPA has identified ozone as a "criteria" pollutant and has promulgated ozone NAAQS. 40 C.F.R. §§ 50.9, 50.10 and 50.19.

publicjustice.net          **National Headquarters**                    **West Coast Office**
                              1620 L Street NW, Suite 630, Washington DC  20036      475 14th Street, Suite 610, Oakland CA  94612
                              (202) 797-8600 phone • (202) 232-7203 fax            (510) 622-8150 phone • (510) 622-8155 fax

Clean Air Act Sixty-Day Notice Letter: JBS-Swift Beef Company
October 1, 2019
Page 2 of 10

EPA designates areas within state boundaries that must achieve the NAAQS. Areas within a state that meet the air quality standards for a particular pollutant are designated "attainment" areas and areas that do not meet the standards are designated "nonattainment" areas. 42 U.S.C. § 7407(d)(1)(A)(i). Unclassifiable areas are treated the same as an attainment area. *Id.* § 7407(d)(1)(A)(iii). The Denver Metro-North Front Range area is classified as non-attainment for ozone. This area includes Greeley.

The Clean Air Act is implemented jointly by EPA and the states. It requires each state to adopt and submit to EPA for approval a State Implementation Plan, or SIP. 42 U.S.C. § 7410. SIPs provide the mechanism for states to ensure compliance with the air quality standards, *id.* § 7410(a)(2)(A), § 7502(c)(6), with EPA's role reserved for approving or disapproving SIPs and taking action when a state's SIP is found inadequate or missing required elements. Once approved by EPA, SIPs become federal law and are enforceable under the Clean Air Act. *See* 42 U.S.C. §§ 7413, 7604; 40 C.F.R. § 52.23. EPA has approved elements of Colorado's State Implementation Plan, 40 C.F.R. § 52.320(c), which is set forth in state regulations implementing the Colorado Air Pollution Prevention and Control Act, C.R.S. §§ 25-7-101 *et seq.*

Colorado's SIP contains an emissions-reporting requirement. That provision provides that no existing, new, or modified stationary source can emit air pollution without submitting an Air Pollution Emission Notice (APEN) to Colorado's Air Pollution Control Division. 5 C.C.R. § 1001-5:3A.II(A) ("[N]o person shall allow emission of air pollutants from, or construction, modification or alteration of, any facility, process, or activity which constitutes a stationary source…from which air pollutants are, or are to be, emitted unless and until an Air Pollutant Emission Notice…has been filed with the Division with respect to such emission."). This requirement applies to sources within nonattainment areas and to each emission point at a stationary source that releases one (1) ton or more per year of a criteria pollutant, like VOCs, in a nonattainment area. 5 C.C.R. § 1001-5:3A.II(B)(3)(a). For reporting purposes, a facility can use actual emission data or apply an appropriate method to estimate emissions. 5 C.C.R. § 1001-5:3A.II(B)(1). APENs must detail the quantity and composition of a facility's emissions, the location of the emissions, the name and address of the persons who operate and own the facility, the nature of the facility, process or activity, and other information required by the applicable APEN form. APEN must be revised when a significant change in operations occurs. 5 C.C.R. § 1001-5:3A.II(C).

Colorado's SIP imposes a pre-construction permit requirement. 5 C.C.R. § 1001-5:3B(II)(A)(1) ("[N]o person shall commence construction of any stationary source or modification of a stationary source without first obtaining or having a valid construction permit."). All sources that annually emit at least two (2) tons per year of VOCs in nonattainment areas trigger the "minor source" permitting requirement. 5 C.C.R. § 1001-5:3B(II)(A)(4); 5 C.C.R. § 1001-5:3B(II)(D)(2)(a). These permits must ensure that the source's emissions do not cause an exceedance of the ozone air quality standard and that the source implements "reasonably available control technology." 5 C.C.R. § 1001-5:3B(III)(D)(1)(c), (d) & § 1001-5:3B(III)(D)(2).

publicjustice.net

National Headquarters
1620 L Street NW, Suite 630, Washington DC 20036
(202) 797-8600 phone

West Coast Office
475 14th Street, Suite 610 Oakland CA 94612
(510) 622-8150 phone

Colorado's EPA-approved SIP also contains a construction permit requirement for new and modified "major" sources. 5 C.C.R. § 1001-5:3D.I(A). "Any new major stationary source or major modification…shall not begin actual construction in a nonattainment area…unless a permit has been issued…" *Id.* A source is a major source when it actually emits or has the potential-to-emit 100 tons per year of VOCs or nitrogen oxides in a "moderate" ozone nonattainment area, or 50 tons per year in a "serious" ozone nonattainment area. 5 C.C.R. § 1001-5:3D.II(A)(25)(b). Major sources of pollution are required to implement or install emission controls—known in nonattainment areas as the "lowest achievable emission rate"—and offset their emissions at the applicable rate. 5 C.C.R. § 1001-5:3D.V(A)(1) & (3).

Violations of the CAA and air permits are enforceable through the Act's citizen suit provision. 42 U.S.C. § 7604(a); *id.* § 7604(f) (defining "emissions standard or limitation" to include permit terms and conditions). For certain violations, this provision requires citizens to send a notice letter to the owners, operators, and permittees of a violating facility, EPA, and the state before bringing suit. *Id.* § 7604(b). A citizen suit may proceed to federal court sixty days after the notice letter, unless either EPA or the relevant state has commenced and is diligently prosecuting a civil action in federal or state court. 42 U.S.C. § 7604(b)(1). As required by the CAA, this letter provides notice of the violations that are occurring at the Plant.

## II.    FACTUAL BACKGROUND

In addition to slaughtering cattle and processing meat, the Plant preserves hides for market. It does so by soaking the hides in a saltwater bath. This process generates a wastewater that for years has been piped, along with slaughterhouse wastes, to the Lone Tree Wastewater Treatment Plant (WWTP). For each quarter between January 2014 and December 2018, discharges from the WWTP into Lone Tree Creek violated JBS-Swift Beef's Clean Water Act permit due to the salt-brine wastewater from hides processing.

To address the water pollution problem, JBS-Swift Beef purchased and installed a "salt evaporator" at the Plant. The evaporator uses a 9.9 MMbtu/hr natural-gas burner that shoots a flame into a submerged tube within the evaporator's tank. Through this heating process, the liquid within the tank evaporates while the salt precipitates out. Before being pumped into the tank, the wastewater is pretreated through a Dissolved Air Floatation unit. The evaporator is designed to process up to between 20,000 and 25,000 gallons of salt-brine wastewater per day. JBS-Swift Beef anticipated using this new equipment five-to-seven days a week, processing 5.2 million gallons of salt-brine wastewater per year. By the end of 2017, JBS-Swift Beef was able to use the evaporator to manage the salt-brine wastewater, however, it was not used in 2018—from January through December 2018, JBS-Swift Beef managed the hides-processing wastewater by sending it to the WWTP. In 2019, JBS-Swift Beef has been using the salt evaporator more regularly in an attempt to comply with its Clean Water Act permit.

The Plant has a Clean Air Act construction permit (Permit No. 95WE757) that covers emissions from the entire Plant and its multiple emission points. With the salt evaporator coming online, JBS-Swift Beef applied to add the evaporator to the Air Permit on February 2,

2015, because it was a new emission point at the Plant (Emission Point 20). On July 20, 2015, APCD issued JBS-Swift Beef an Air Permit modification for the evaporator, addressing NOx and CO emissions from the evaporator's fuel combustion process, which were calculated using the AP-42 emission factors for small boilers. There was no public comment on this Air Permit modification.

The Air Permit includes terms that required JBS-Swift Beef to provide APCD certain information related to the new salt evaporator. The company was supposed to notify APCD when evaporator operations began, develop an operations and maintenance plan for the salt evaporator, provide details about the new equipment, certify to the APCD the company's compliance with the Air Permit's terms, and comply with limits on fuel consumption and emission limits.

The Air Permit also contains terms and conditions that require JBS-Swift Beef to assess the organic compound content of the wastewater and, if organic compounds are found, seek a permit modification that addresses VOC emissions from the salt evaporator. It is slaughterhouse-industry practice to use chemicals to disinfect and sanitize post-harvest animal carcasses, eliminating or curtailing the growth of pathogens, like *E. coli* and salmonella. The chemicals JBS-Swift Beef uses for this purpose contain organic compounds that are absorbed into the hides.

At the time APCD issued the Air Permit modification, the salt evaporator did not include any emission controls for NOx and CO because such emissions did not cause the Plant to exceed relevant thresholds. But because of concern over particular matter (PM) emissions, which had not previously been considered when the Air Permit modification was issued, JBS-Swift Beef purchased and installed a wet scrubber in 2017. In July 2018, JBS-Swift Beef applied for another permit modification to add the newly installed scrubber and account for PM emissions. That permit application is currently pending with the APCD and has not been issued, in part because JBS-Swift Beef has not supplied required information.

## III.    JBS-SWIFT BEEF'S CLEAN AIR ACT VIOLATIONS—VIOLATIONS OF THE 2015 AIR PERMIT

JBS-Swift Beef is violating the following terms of the 2015 Air Permit as it applies to the salt evaporator and Emission Point 20.

1.    Notice of Startup: Paragraph 1 of the Air Permit requires JBS-Swift Beef to submit a Notice of Startup to the APCD. The submission must be made within 15 days of commencing operations of the salt evaporator.

JBS-Swift Beef has not submitted the requirement Notice of Startup despite beginning to operate the salt evaporator more than fifteen days ago. This permit requirement is rooted in Regulation 3, Part B, Section III.G.1 and included in the SIP approved by EPA. 40 C.F.R. § 52.320(c).

Clean Air Act Sixty-Day Notice Letter: JBS-Swift Beef Company
October 1, 2019
Page 5 of 10

2.     Initial Compliance Testing: Paragraphs 4 and 20 of the Air Permit require JBS-Swift Beef to conduct initial compliance testing within 180 days of operating the salt evaporator and submit the results to the APCD. JBS-Swift Beef is required to sample (a) the salty wastewater leaving the DAF once a month for the first three months of operations and (b) the salt leaving the salt evaporator. The samples shall be analyzed for organic content concentration using applicable EPA methodologies. Based on the results of this testing, JBS-Swift Beef shall comply with APEN and permit modification requirements.

It has been over six months since JBS-Swift Beef began operating the salt evaporator and JBS-Swift Beef has not conducted the testing and sampling and has not submitted the results. This permit requirement is rooted in Regulation 3, Part B, Section III.E and included in the SIP approved by EPA. 40 C.F.R. § 52.320(c).

3.     Operating and Maintenance Plan Development: Paragraphs 5 and 19 of the Air Permit mandate that JBS-Swift Beef prepare and submit to the APCD a revised operations and maintenance (O&M) plan. O&M plan submission was due 180 days after commencing operations of the salt evaporator. The O&M must detail how JBS-Swift Beef intends to comply with the Air Permit and its terms and conditions.

JBS-Swift Beef has not submitted the required O&M plan to APCD even though the salt evaporator began operations more than 180 days ago. This permit requirement is rooted in Regulation 3, Part B, Section III.E and included in the SIP approved by EPA. 40 C.F.R. § 52.320(c).

4.     Salt Evaporator Specifications: Paragraph 7 of the Air Permit requires JBS-Swift Beef to provide APCD with the model number and serial number for Emission Point 20. This information was required within 180 days of commencing operations of the salt evaporator.

JBS-Swift Beef provided the required information for the scrubber in its application for an Air Permit modification in July 2018, but has not done so for the salt evaporator despite beginning operating the evaporator more than 180 days ago. This permit requirement is rooted in Regulation 3, Part B, Section III.E and included in the SIP approved by EPA. 40 C.F.R. § 52.320(c).

5.     Self Certification: Paragraph 2 of the Air Permit obligates JBS-Swift Beef, within 180 days commencing operations of the salt evaporator, to demonstrate and certify to APCD that it has complied with terms and conditions specific to Emission Point 20.

JBS-Swift Beef has not demonstrated compliance to APCD or met the self-certification requirement. JBS-Swift Beef began operating the salt evaporator more than 180 days ago. This permit requirement is rooted in Regulation 3, Part B, Section III.G.2 and included in the SIP approved by EPA. 40 C.F.R. § 52.320(c).

6.    Fuel Consumption Limits: Paragraph 11 of the Air Permit sets forth fuel consumption rate limits (both annual and monthly) for all emission points at the Plant. JBS-Swift Beef must comply with fuel consumption rates (1,557,276 MMbtu/year and 132,261.8 MMbtu/month) for specific emissions points that include Emission Point 20 (the salt evaporator). Compliance with these consumption rates must be demonstrated to the APCD through the self-certification process.

JBS-Swift Beef did not provide actual fuel consumption for each of the first 12 months after commencing operations at the salt evaporator. In March 2019, JBS-Swift Beef informed the state that the salt evaporator has a maximum firing rate of 9.9 MMbtu per hour, but has not demonstrated compliance with the Air Permit's fuel consumption limits. This permit requirement is rooted in Regulation 3, Part B, Section II.A.4 and included in the SIP approved by EPA. 40 C.F.R. § 52.320(c).

7.    Emission Limits: Paragraph 9 of the Air Permit sets forth emission limits for criteria pollutants released from the salt evaporator as well as other emissions points at the Plant. These limits are expressed on a monthly and annual basis. For the first 12 months of operating the salt evaporator and scrubber (Emission Point 20), JBS-Swift Beef must comply with both the monthly and annual limits for all criteria pollutants and the annual rate thereafter. Compliance with these emission limits must be demonstrated to the APCD through the self-certification process, which was due within 180 days of commencing operations of the salt evaporator.

JBS-Swift Beef has not certified compliance with the emission limits for each of the first 12 months of operating the salt evaporator or the annual emission limits. This permit requirement is rooted in Regulation 3, Part B, Section II.A.4 and included in the SIP approved by EPA. 40 C.F.R. § 52.320(c).

JBS-Swift Beef's violations of the Air Permit, as described above, are actionable under the CAA's citizen suit provision. 42 U.S.C. § 7604(a)(1); *see* 42 U.S.C. § 7604(f) (defining "emission standard or limitation").

## IV.    RELIEF TO BE REQUESTED

To remedy these violations, we intend to ask that the court order JBS-Swift Beef to pay civil penalties, up to the amount authorized by Clean Air Act. JBS-Swift Beef is liable for violations occurring each day these violations continue. Penalties are calculated based on statutory limits and factors. *See* 42 U.S.C. § 7413(e); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

We will also seek declaratory relief, confirming that the JBS-Swift Beef has violated and continues to violate the Clean Air Act. We will seek injunctive relief that requires the JBS-Swift Beef to take all actions necessary to comply with the Air Permit and Clean Air Act. Lastly, we intend to seek the recovery of costs, including attorney and expert fees, as authorized by the CAA.

## V.    PARTIES GIVING NOTICE

The parties giving notice, including their full names, addresses and telephone numbers, are as follows:

Center for Biological Diversity
Attn: Michael Saul
1536 Wynkoop St., Ste. 421
Denver, Colorado 80202
(303) 915-8308

Food & Water Watch
Attn: Tyler Van Kirk
1801 N. Williams St., Ste. 400
Denver, Colorado 80218
(720) 372-1389

Center for Biological Diversity is a national non-profit, 501(c)(3) organization with multiple offices and thousands of members in Colorado. The Center has programs and campaigns that address the plight of imperiled species in this country, including the extensive harms caused by animal agriculture on biodiversity, public health, and sustainable food systems. Through its efforts, the Center has developed outreach, education, and policy materials on the negative effects of industrial agricultural systems on our environment, including as a result of pesticide use, greenhouse gas emissions, and air and water pollution from animal waste.

Food & Water Watch is a national nonprofit organization that champions healthy food and clean water for all by standing up to corporations that put profits before people and by advocating for a democracy that improves people's lives and protects the environment. FWW maintains an office in Denver and has more than 12,000 members in Colorado. Factory farming is one of FWW's priority issues, and FWW is engaged in numerous campaigns to hold the factory farm industry—including corporate slaughter facilities—accountable for its adverse impacts on rural communities and the environment. Through grassroots organizing, policy

advocacy, research, communications and litigation, FWW works to increase transparency about the factory farm industry's harmful impacts, reduce meat companies' pollution of our air and waterways, and strengthen public and government oversight of livestock production.

Counsel for Center for Biological Diversity and Food and Water Watch has been retained and their contact information is:

Neil Levine
nlevine@publicjustice.org
(303) 455-0604
Brent Newell
bnewell@publicjustice.org
(510) 622-8209
Public Justice
4404 Alcott Street
Denver, Colorado 80211

Hannah Connor
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
(202) 681-1676
hconnor@biologicaldiversity.org

Tarah Heinzen
Food & Water Watch
2009 NE Alberta St. Ste. 207
Portland, OR 97211
(202) 683-2457
theinzen@fwwatch.org

Please contact Neil Levine at Public Justice if you would like to discuss the content of this letter.

***

Center for Biological Diversity and Food & Water Watch believe that this letter provides JBS-Swift Beef with sufficient information about the alleged violations and ways to ensure compliance with the Clean Air Act and the Air Permit. They intend to file a citizen suit under the CAA, 42 U.S.C. § 7604(a), against JBS-Swift Beef for the above-referenced violations upon the expiration of the 60-day notice period. Additional information, including information not yet available to the Center for Biological Diversity and Food & Water Watch, may reveal additional violations, which this letter intends to cover.

Clean Air Act Sixty-Day Notice Letter: JBS-Swift Beef Company
October 1, 2019
Page 9 of 10

These organizations would welcome the opportunity to discuss this matter with you and potentially resolve any disputes so as to avoid time-intensive and resource-consuming litigation. Please contact us promptly if you believe we do not understand facts about the Plant and the alleged violations correctly or wish to discuss effective remedies for the violations noted in this letter. We do not intend to delay the filing of a complaint in federal court if discussions are continuing at the conclusion of the 60-day period. Thank you.

Sincerely,

/s/ Neil Levine

Neil Levine
Brent Newell
Public Justice

Hannah Connor
Center for Biological Diversity

Tarah Heinzen
Food & Water Watch

cc:

Administrator Andrew Wheeler
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Ave., NW
Mail Code 1101A
Washington, D.C. 20460

Regional Administrator Gregory Sopkin
Environmental Protection Agency Region 8
1595 Wynkoop Street
Mail Code 8RA
Denver, CO 80202-1129

U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Clean Air Act Sixty-Day Notice Letter: JBS-Swift Beef Company
October 1, 2019
Page 10 of 10


Jill Hunsacker Ryan
Executive Director
Colorado Department of Public Health and Environment
4300 Cherry Creek Drive South
Denver, CO 80246

Corporation Services Co.
Registered Agent for JBS USA and JBS-Swift Beef
1900 West Littleton Blvd.
Littleton, Colorado 80120



U.S. POSTAGE PAID
FCM LETTER
DENVER, CO
80211
OCT 01. 19
AMOUNT
**$0.70**
R2304P119017-99

1000

Corporation Services Co.
Registered Agent (JBS USA, JBS Swift)
1900 West Littleton Blvd.
Littleton, Colo. 80120

80120-3023 C002

**PUBLIC JUSTICE**
IMPACT. CHANGE.

1620 L Street NW, Suite 630
Washington DC 20036

# EXHIBIT F



**Mr. Mark Ritsema**
JBS USA, LLC
1770 Promontory Circle
Greeley, CO 80634

Submitted via email to:  Mark.Ritsema@jbssa.com

RE:    Brine Evaporator System Opacity Issues
       CRM No. 60031

**Dear Mr. Ritsema,**

August 27, 2020

Ramboll is pleased to provide this proposal for technical assistance to JBS USA (JBS) to evaluate and provide recommendations to resolve the present opacity issue associated with the submerged combustion brine evaporator system at your Greeley, Colorado facility.  This proposal has been developed based upon our recent teleconference and email correspondence and represents our project execution plan.

JBS's Salt Recovery Facility employs a submerged combustion evaporator system, manufactured by Inproheat Industries, Ltd to recover salts from brine water.  The exhaust from the evaporator system is directed through a Centrifield® High Efficiency Vortex Scrubber, manufactured by Entoleter, prior to being discharged to atmosphere.  Despite being conditioned by the scrubber, the system's exhaust, at times, exhibits visible emissions that can exceed allowable opacity limitations. JBS has engaged Ramboll to evaluate the cause of the visible emissions and identify a pathway to a solution.

**Scope of Work**

Ramboll proposes taking a phased approach in the execution of this project. Each phase will determine the scope of the phase that follows, and Ramboll can submit separate proposals for each phase based upon the established scope. This approach will maximize JBS's implementation flexibility and minimize costs.

Briefly summarized, the steps associated with each phase are as follows:

Ramboll
Bentwood Campus
301 East Germantown Pike
3rd floor
East Norriton, PA 19401
USA

T 484-804-7200
F 215-628-9953
https://ramboll.com

CRM No. 60031

RAMBOLL

| Phase | Step |
|-------|------|
| **Phase I - Discovery** | 1. Collect emissions data and establish a Process Basis of Design (PBOD) for the exhaust stream. <br> 2. Based on the PBOD, assess whether the existing scrubber should be able to, or potentially could be modified to, meet performance objectives. <br> 3. Based on the PBOD, identify alternate technically feasible solution strategies that could be employed to meet performance objectives. |
| **Phase II – Establish Cost Feasibility** | 1. Assess the cost feasibility of modifying the existing scrubber to meet performance objectives (if possible) against the implementation of alternate solution strategies.  This will involve the development of high-level budgetary costs estimates and may require an internal inspection of the scrubber system.  The ultimate objective of this phase is to establish the best solution strategy for JBS to pursue. |
| **Phase III – Detailed Design & Cost Estimate** | 1. Develop a detailed design and installed cost estimate for the selected solution strategy through the implementation of a stage-gated, Front-End-Loading design process. |
| **Phase IV: Construction Support** | 1. Once a contractual mechanism for procurement and construction is identified, support JBS with specific deliverables need to advance those efforts. |

This proposal includes pricing associated with <u>Phase I only</u>.  A more detailed description of the tasks included in this Phase are described in the following paragraphs.

**Task 1 - Kickoff Meeting**
Upon authorization, Ramboll will schedule a kickoff meeting, to be completed via teleconference, to review the scope of the project, project deliverables, project schedule, lines of communication and other project-related details.  The meeting is intended to align everyone's understanding and expectations regarding roles and responsibilities, deliverables, schedule, etc.  Meeting minutes will be distributed within one (1) week of the meeting.

Prior to the kickoff meeting, Ramboll will submit a Request for Information (RFI) to JBS for available drawings, process data, documents, and other pertinent details associated with the system to be assessed, which can be discussed during the kickoff.

**Task 2 – Scrubber Performance Testing**
Ramboll will engage Alliance Source Testing (Alliance) to perform the testing protocols outlined in their Proposal No. AI-2020-1136R1, dated August 4, 2020, which is included as Attachment 1.  Ramboll's Phase 1 proposal estimate includes Option 1 of Alliance's proposal, (which includes 2 simultaneous runs on the inlet and outlet of the scrubber to determine filterable and condensable particulate matter (PM) loadings), and selective electron microscopy (SEM) analyses on the samples collected for each run to determine particle size distribution.  Additional sample runs or analyses will be billed at cost plus 10% in accordance with our terms and conditions.



Ramboll will manage the Alliance sub-contract on behalf of JBS, but we assume that JBS can provide appropriate personnel to support Alliance while they are on-site conducting the test.

**Task 3 – Establish a Process Basis of Design (PBOD)**
Using the data collected in Task 2 and process information provided by JBS, Ramboll will develop a Process Basis of Design (PBOD) document that will quantify the important parameters of the exhaust stream needed by abatement equipment suppliers to design an appropriate abatement system and provide an emissions guarantee. This information will also be provided to the existing scrubber manufacturer to enable them to troubleshoot the performance issues associated with their device.

**Task 4 – Performance Assessment**
Drawing upon our collective experience with similar systems, Ramboll will use the PBOD to:

- Identify the root cause of the exhaust plume (*e.g.,* particle size, condensation, etc.).
- Identify alternative technically feasible strategies that could be employed to mitigate the plume.
- Engage the existing scrubber manufacturer (Entoleter) to assess if their technology should be able to mitigate the plume and, if so, identify the modifications or next steps required to do so.

Ramboll will summarize this information in a brief letter report, which will suggest a path forward.

## Schedule

Work will begin immediately upon receiving JBS's purchase order. Source testing will be scheduled to occur as soon as practical at a time mutually acceptable to JBS and Alliance. The PBOD will be submitted within two weeks of receiving Alliance's source testing report (including laboratory analysis results), and the final performance assessment letter report will be submitted within 2 to 3 weeks of completing the PBOD (pending the scrubber vendor's prompt responsiveness). We estimate that the entire project as described herein might take 4 to 5 weeks after receipt of testing results to fully implement.

## Fee and Terms

Ramboll proposes to complete the proposed scope of work on a time and material basis for a total price not to exceed **$34,890.00**, itemized as follows:

- Ramboll Engineering & Project management - **$9,975.00**
- On-site Source Testing - **$24,915.00**

Ramboll will invoice monthly based upon worked performed. Invoices are Net, 30 days. JBS's purchase order should reference the Standard Terms & Conditions, attached.

## Assumptions and Clarifications

- JBS will be able to provide technical details for the equipment necessary to perform the assessment.
- A site visit by Ramboll is not presently included in the submitted pricing.

3/4



- JBS will provide suitable testing ports on the inlet and outlet of the scrubber for the source testing crew's use.  Ramboll will coordinate with Alliance to establish test port requirements and communicate this information to JBS.
- JBS shall be responsible for providing safe access to the testing ports for testing personnel and their equipment.  This is anticipated to be either dual manlifts (dedicated lifts for the inlet and outlet), scaffolding, or a combination thereof.
- The submitted pricing is based upon Option 1 of Alliance's proposal plus SEM analysis on both inlet and outlet samples for 2 runs.  Please reference Alliance's proposal regarding potential additional charges that could be incurred for delays, weekend work, etc.  Contingencies for such charges have <u>not</u> been included in Ramboll's submitted pricing and will be passed through at cost plus 10% if incurred.
- Alliance's proposal and their terms and conditions shall be incorporated into Ramboll's proposal and carried through to any subsequent purchase order solely for Alliance's scope of work.
- If, for whatever reason, Alliance cannot perform the work, another source testing company will be engaged for a similar scope.  Their pricing and agreed upon terms and conditions will be carried through to JBS at cost plus 10%, pending JBS's prior approval.

We appreciate the opportunity to assist you with this project. If you have any questions on this proposal, please do not hesitate to contact Eric Hodek at (281) 896-3648 or me at the contact information provided below.

Yours sincerely

**Michael Mannuzza**
SME/TECHNICAL MANAGER-1

D 815-788-1312
M 815-575-2997
michael.mannuzza@ramboll.com

**Eric S. Hodek**
PRINCIPAL

D 303 382 5467
M 281 896 3648
ehodek@ramboll.com

Cc:        William Norris, Ramboll

Attachment:  Attachment 1 - Alliance Source Testing Proposal No. AI-2020-1136R1
                Attachment 2 - Standard Terms and Conditions

*The information presented in this proposal is CONFIDENTIAL and strictly for the use of the party to whom it is addressed. This information should not be copied or otherwise utilized without the written permission of Ramboll.*



August 4, 2020

Eric Hodek
Principal
Ramboll Environ
1560 Broadway, Suite 1905
Denver, CO 80202
D 303-382-5467
Eric.hodek@ramboll.com

Michael Mannuzza
SME / Technical Manager – 1
Ramboll Environ
D 815-788-11312
M 815-575-2997
Michael.mannuzza@ramboll.com

RE:    **Engineering Testing**
    **AST Proposal No. AI-2020-1136R1**

Dear Mr. Hodek, Mr. Mannuzza,

Alliance Source Testing, LLC (AST) appreciates the opportunity to provide Ramboll Environ (Ramboll) with this proposal. AST understands that Ramboll desires engineering testing at the JBS facility in Greeley, Colorado. Testing will include determining the emission rates of filterable particulate matter (FPM) and condensable particulate matter (CPM) at the inlet and outlet of the Scrubber. Particle sizing distribution (PSD) by selective electron microscopy (SEM) analysis is also proposed as part of the sample analysis procedure. AST's complete emission testing and analytical approach is included as an attachment.

By selecting AST to perform the emission testing, Ramboll will greatly benefit from our desire and ability to mobilize and respond quickly and efficiently to your needs. AST provides source testing solutions to our partners throughout the United States. With our expertise in performing U.S. EPA, SW-846, CARB, NIOSH and NCASI test methods and our 13 strategically located offices, we are uniquely qualified to provide Ramboll with the highest quality and most cost-effective source testing solutions available. Our approach is unique in the industry in that we utilize a centralized approach to all operations within the company. We look at this in three (3) areas – People, Process, and Technology.

AST's people are educated, trained, and experienced with a focus on quality and communication. Our process includes a centralized approach including procedures that maximize our results and quality. For example, our personnel are provided with Wi-Fi-enabled mobile labs and pre-configured test data templates. Data is immediately uploaded to our centralized server where our Technical Services and QA teams begin the process of data review and report creation. With a dedicated Technical Services Team providing all proposals, protocols and reports, our quality control, responsiveness and scalability are unmatched. Finally, we utilize a proprietary software program for capturing pre-test, test, and post test data for each source, project, and customer and maintain this database for future access, data analytics, and historical reference.

AST currently has 13 offices, more than 60 mobile laboratories, over 200 total employees, and over 80 QSTI qualified Project Managers (PM) who will oversee the field testing for each phase of testing for Ramboll. Each PM will have multiple responsibilities associated with these projects including field testing, field testing supervision, test plan and report development and/or review, and quality assurance/quality control review. Our ability to provide resources to meet the largest or smallest customer need is unmatched in our industry.

We invest heavily into creating a system that ensures efficient response to customer needs. The foundation of that effort is our *2+2+2 Alliance Advantage*. We guarantee that we will provide a cost estimate within **two (2) business days** of receiving a firm scope of work, a draft protocol/test plan within **two (2) business days** of receiving customer acceptance of this proposal, and a draft test report within **two (2) weeks** of the completion of field work (or if laboratory analysis is required, the guarantee is **two (2) business days** from receipt of laboratory data). We have a Technical Services Division that is dedicated solely to ensuring the quality of data and generating proposals, test plans and test reports for our customers.

**CORPORATE OFFICE**

255 Grant St. SE
Suite 600
Decatur, AL 35601
(256) 351-0121

stacktest.com

**LOCATIONS**

Birmingham, AL
Decatur, AL
Anchorage, AK
Little Rock, AR
Denver, CO
Cedar Rapids, IA
Baton Rouge, LA

Pittsburgh, PA
Philadelphia, PA
Dallas, TX
Houston, TX
Salt Lake City, UT
Roanoke, VA





The attached project summary outlines our understanding of your requirements, describes our approach to meet your needs, and presents assumptions we made to develop the following **lump sum cost** estimates to conduct this testing. **Optional Site Visit** is priced at **$750**. Pricing is valid for ninety (90) days after proposal issuance date.

Option 1: PM/CPM Testing simultaneous at the inlet / outlet locations - **$15,150**    (2 runs assumed)

Option 2: PM/CPM Testing sequential at the inlet / outlet locations - **$12,850**    (2 runs assumed)

Cost Adder per run for additional PM/CPM runs (inlet and outlet) - **$1,400**

Cost Adder per run for additional PM/CPM runs (inlet or outlet) - **$1,200**

Cost Adder per run for SEM Analysis inlet or outlet (per run indicates two fractions, rinse and filter fractions) - **$2,050**
*cost adder if both inlet and outlet sample analyses desired is **$3,750** per run (run = two fractions, rinse and filter)

The lump sum cost estimate is predicated on Net 30-day payment terms (as outlined in more detail in the enclosed Terms & Conditions). AST invoices upon completion of field work and offers a 1% discount if payment is received upon receipt of the Draft Report.

AST encourages customers to issue Purchase Orders for 15% more than the lump sum cost estimate to account for any potential Additional Charges (outlined in detail on the following pages).

**To move forward with this project and reserve your preferred date(s) for field work, please sign and return the Customer Proposal Acceptance below and issue a Purchase Order for the applicable amount to PO@stacktest.com**

We look forward to working with you on this project. Please do not hesitate to contact us at (720) 457-9515 to discuss this proposal.

Sincerely,
**Alliance Source Testing, LLC**

David Maiers, QSTI
Operations Manager – Midwest Region

Chris LeMay
Chief Executive Officer

*Customer Proposal No. AI-2020-1136R1 Acceptance*

I have reviewed and accept this Proposal and the Terms & Conditions included herein. By signing the below, I am awarding this business to Alliance Source Testing and am authorizing them to proceed with this project.

Signature: _____

Name: _____

Title: _____

Date: _____

Enclosure

**CORPORATE OFFICE**
255 Grant St. SE
Suite 600
Decatur, AL 35601
(256) 351-0121

**stacktest.com**

**LOCATIONS**

Birmingham, AL
Decatur, AL
Anchorage, AK
Little Rock, AR
Denver, CO
Cedar Rapids, IA
Baton Rouge, LA

Pittsburgh, PA
Philadelphia, PA
Dallas, TX
Houston, TX
Salt Lake City, UT
Roanoke, VA

